720 A.2d 27

Arnold BRAXTON

v.

STATE of Maryland.

Nos. 1354, 1355, Sept. Term, 1997.

Court of Special Appeals of Maryland.

Nov. 6, 1998.

600

602

604

606

Eileen A. Canfield (Law Student admitted pursuant to Rule 16) (Stephen E. Harris, Public Defender, Denise Oakes Shaffer and Bradford C. Peabody, Asst. Public Defender, on the brief), Baltimore, for Appellant in No. 1353.

Denise Oakes Shaffer, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant in No. 1355.

Emmet Davitt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia Jessamy, State's Atty. for Baltimore City, on the brief), Baltimore, for Appellee.

Argued before HOLLANDER, BYRNES and ADKINS, JJ.

HOLLANDER, Judge.

On April 30, 1996, Mark Williams and Charles Carroll were robbed in Baltimore City by two men; one robber brandished a .25 caliber handgun and the other wielded a .38 caliber weapon. After the robbers fled the scene, the victims informed a police officer of what had occurred. Later that evening, the police apprehended the robber who had allegedly carried the .38 caliber weapon. Further investigation led the police to suspect that Arnold Braxton, appellant, was the robber who had used the .25 caliber firearm.

Subsequently, Detective Alvin Gwynn obtained Braxton's photograph and included it in a photo array that he displayed to Mr. Williams. After the victim identified appellant as one of the robbers, the detective obtained appellant's address from his arrest record, and then procured a search warrant for that address: Apartment 203, 4310 Seminole Avenue, Baltimore, Maryland. Several officers joined Detective Gwynn in executing the search warrant; the search led to the discovery of a .25 caliber weapon matching the description of one of the guns used in the robbery. Ballistics tests also linked the weapon to the murder of Melvin Alexander, Jr., whose body was found in his car on April 26, 1996. Consequently, appellant was

charged with the armed robbery of Mr. Williams and Mr. Carroll, as well as the murder of Mr. Alexander.[1]

The legality of the search warrant issued for appellant's residence was a central issue below, as it is here. At a hearing held prior to the murder trial, the court (Alpert, J.) denied appellant's motion to suppress the fruits of the search. Thereafter, at two successive jury trials commencing in July 1997 in the Circuit Court for Baltimore City, appellant was convicted of the first degree murder of Mr. Alexander ("Trial I" or the "murder trial"), the armed robbery of Mr. Williams and Mr. Carroll ("Trial II" or the "robbery trial"), and related offenses.[2] At a joint sentencing hearing held on September 3, 1997, the court sentenced twenty-one year old Arnold Braxton to a total of life imprisonment plus 20 years.[3]

Appellant timely noted his appeal in each case. Although these appeals present a host of unrelated questions, we shall consider the appeals together, because they present identical

---

1. Based on the ballistics tests, appellant was actually charged with three unrelated murders. The State unsuccessfully sought to join for trial all three murder cases and the robbery case; the other two murder cases are not at issue here.

2. Specifically, at the murder trial, the jury found appellant guilty of the following: first degree murder; unlawful use of a handgun in the commission of a felony or crime of violence; and unlawful wearing, carrying, or transporting a handgun. In connection with the robbery trial, the jury convicted Braxton of two counts of armed robbery and two counts of unlawful use of a handgun in the commission of a felony or crime of violence.

3. In particular, the court imposed the following sentences: life imprisonment for first degree murder; a consecutive sentence of ten years (the first five without parole) for use of a handgun in the commission of a felony; twenty years, consecutive to the life sentence, for the armed robbery of Mr. Carroll; ten years (the first five without parole), for the use of a handgun in the commission of a felony, concurrent with the prior twenty year sentence; twenty years for the armed robbery of Mr. Williams, consecutive to the life sentence but concurrent with the sentence for the armed robbery of Mr. Carroll; and ten years (the first five without parole) for the use of a handgun in the commission of a felony, concurrent with the sentence for the armed robbery of Mr. Williams.

**610**

challenges to the search warrant.[4] Braxton presents the following questions for our consideration, which we have condensed and reformulated:

I. With respect to Trial I and Trial II, did the court err in denying the motion to suppress evidence recovered during the execution of the search warrant issued for appellant's residence?

 A. Was the search warrant supported by probable cause?

 B. Even if the search warrant was not supported by probable cause, does the good faith exception apply?

 C. Was the affidavit tainted due to police misrepresentation regarding the witness's identification in the photo array?

II. In Trial I, did the court err in permitting an expert witness to testify that the gun admitted into evidence met the statutory definition of a handgun under Md. Code (1957, 1996 Repl.Vol.), Art. 27 § 36B?

III. In Trial I, did the court's erroneous submission to the jury of the attempted carjacking charge improperly influence the jury with respect to the first degree murder charge?

IV. In Trial I, was the evidence sufficient to convict appellant of first degree premeditated murder?

V. In Trial II, did the court improperly deny two unrelated motions for mistrial, each of which concerned objectionable testimony from two police officers?

VI. In Trial II, was the evidence sufficient to support the robbery conviction?

---

4. Although each party submitted separate briefs for each appeal, the respective briefs contain virtually the same four or five page discussion concerning probable cause. We also note that both appeals were set for oral argument on the same date. Surprisingly, the parties waived argument as to the murder case, and, in argument regarding the robbery case, appellant's counsel focused primarily on the motions for mistrial.

## I. THE MOTIONS TO SUPPRESS

### A. Factual Summary

With respect to both the murder and robbery trials, appellant moved to suppress the tangible evidence recovered during the search of Braxton's residence, including a .25 caliber handgun recovered from under the pillow of the bed located in appellant's bedroom. At the suppression hearing, appellant contended that the search was not based on probable cause, because the affidavit failed specifically to identify the subject premises as appellant's residence, and it did not indicate how the police knew appellant resided at the particular premises.

As the content of the warrant is critical to our resolution of the probable cause issue, we shall begin by setting forth the text of the affidavit appended to the search warrant application: [5]

Persons/Premises to be Searched:

Arnold Braxton, Jr.[6] M/B/10–31–75 BPI# 440–492, 4310 Seminole Ave. Apt. A three story brick apartment building with the numbers 4310 affixed. Apt. 203 has a white door the numbers 203 on same.

Property to be Seized:

One mens [sic] leather Nautica Jacket, one Motorola Cellular phone w/ black case, one Pagenet Pager w/ black case and one chrome handgun .25 cal. As well as any other evidence related to the commission of the crime of robbery.

---

**5.** We note that neither the search warrant nor the affidavit has been included in the record for either appeal. Nor does the record contain signed copies of these documents. As best we can determine, the circuit court reviewed unsigned copies of the affidavit and warrant. Pursuant to this Court's order granting appellant's Motion to Supplement the Record, an unsigned copy of the warrant and affidavit, as well as the transcript for a motions hearing held on July 29, 1997, have now been added to the record.

**6.** We observe that appellant has been identified as Arnold Braxton, **Jr.** only in the search warrant application. Appellant has not lodged any complaints on this basis.

Your Affiant Det. Alvin Gwynn has been a member of the Baltimore Police Department for seven years. During this tenure Your Affiant has worked in both uniformed and plainclothes capacities. Your Affiant has made over fifty arrest [sic] for felony offenses where handguns have been used and has written over fifty search and seizure warrants for various offenses. Your Affiant has received training in the area of robbery through roll call training as well as the Baltimore Area Robbery Conferences.

Your Affiant Does Attest to the following:

On 30 April 1996 Mr. Mark Williams was standing in the 700 block of Kevin Road. While conversing with his friend Mr. Charles Carroll they were approached by two black males who produced handguns and demanded currency. Mr. Williams and Mr. Carroll complied giving the suspects a total of $40.00 currency. The suspects also took a Nautica jacket leather coat, motorola cellular phone and pager from Mr. Carroll. Additionally, the suspects searched the vehicles of both Mr. Carroll and Mr. Williams, during which time Mr. Williams' small children were in his vehicle. The suspects fled the scene on foot with the property. A uniformed officer on patrol was flagged down by Mr. Williams and Mr. Carroll and advised of the robbery which had just occurred. The officer spotted the suspects in the 1000 block of Kevin Rd. A chase ensued and shots were exchanged between one of the suspects and the officer; the officer was injured as a result. After a lengthy standoff the suspect was apprehended and identified as Nathaniel Powell M/B/6-22-78. Further investigation by Your Affiant revealed the name of a possible second suspect in the robbery as Arnold Braxton M/B/10-31-75. A photograph of Mr. Braxton was obtained from the Baltimore City Identification Section and a photo array consisting of six photographs similar in nature was compiled. The photo array was shown to Mr. Mark Williams who positively identified the photograph of Arnold Braxton, BPI# 4440492 as the individual who robbed him on 30 April 1996. A warrant was obtained for Mr. Braxton under warrant number 1B00130712.

It is common for persons who have committed armed robberies to store the fruits of their crimes in the place of their residence as well as the weapons used to commit these offenses. It is for this reason that Your Affiant prays that a search and seizure warrant be issued for the above named persons and premises.

At the suppression hearing, defense counsel argued:

[T]here is nothing whatsoever in the affidavit that states why this particular premises was sought to be searched. There's nothing in there that indicates what the alleged connection is between Mr. Braxton and the premises at 4310 Seminole Avenue.

\* \* \*

I think they have to have something in the affidavit that indicates that this is, in fact, his premises and there's nothing in the affidavit whatsoever to indicate that this is, in fact, Mr. Braxton's premises.

\* \* \*

[I]t doesn't say he lives there, Your Honor. What the affidavit says—it doesn't say anywhere that he lives there. What the affidavit says about the premises is precisely this. It says, "Person/premises to be searched: Arnold Braxton, Jr., M/B," male/black, "10/31/75, BPI No. 440–492. 4310 Seminole Avenue, apartment, a three-story brick apartment building with the numbers 4310 affixed. Apartment 203 has a white door with the numbers 203 on same." It doesn't indicate in any way—that's the one and only reference in this affidavit to that dwelling, to that address.

\* \* \*

But it does not say anywhere that this residence is, in fact, Mr. Braxton's residence. It doesn't say anywhere that this address is Mr. Braxton's residence, I should say. All it has is that conclusory statement about what people keep at their

residences. As I say, the only reference to that address is in the heading where it says "persons to be searched," "places to be seized."

It might be possible to infer from that, maybe, that that address is Mr. Braxton's address since it's under his name and his BPI number. It's also possible to infer from that equally—it's equally reasonable to infer from that simply that that is, in fact, the place to be searched and that it doesn't necessarily have any connection with Mr. Braxton since what it says—it's under the heading "persons/places to be searched." We have a person, Mr. Braxton. We have a place, the address on Seminole Avenue.

Even if it said somewhere in the warrant that this is Mr. Braxton's address, that still wouldn't make the warrant— the affidavit any less deficient because the determination as to whether there's probable cause to believe that this particular address is related to Mr. Braxton has to be made by the magistrate to whom the affidavit was presented and not by the police officer, the affiant presenting the affidavit.

* * *

It would have been easy enough if the police had that kind of information to have put in this affidavit that "These premises on Seminole Avenue are the residence of Arnold Braxton and that that is known to be true because we checked with the rental office. We went to that location and his name was on the mail box. We checked with gas and electric records and his name was on there," or "We did surveillance. We saw him going in and out," any one of a million different things.

None of that is in there. All the magistrate presented with this affidavit could do would be to speculate that, number one, these premises are, in fact, connected with Mr. Braxton and (b) that the police have some evidence that makes them think that the premises are connected with Mr. Braxton. There is nothing in here from which the magistrate could make an independent determination that proba-

ble cause existed connecting these premises with Mr. Braxton and, therefore, while there was probable cause to search the person of Mr. Braxton based on this affidavit, there was no probable cause to search the dwelling.

The prosecutor responded that the affidavit described the premises with sufficient particularity and no "connection" had to be shown. Moreover, based on *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the State argued that suppression was not required in any event, because the police officer had an objective, good faith belief that he had probable cause to conduct the search. The defense disagreed, but the matter of good faith was not pursued because the court expressly indicated that it was not relying on *Leon.* Thus, the trial court did not reach the merits of the good faith claim.

Although the trial court agreed that the affidavit should have been "much more articulate," it denied the motion to suppress. The court reasoned:

The Supreme Court [and] Maryland cases [have] spoken most convincingly about the preference for warrants, especially for the search of premises.... [T]hese are judges trained in the law and presumed to know the law.

In reading the affidavit, on the first page, it is stated "Arnold Braxton, Jr.; premises, 4310 Seminole Avenue, Apartment 203." I have no difficulty deciding that the judge that signed this search warrant inferred that this was the residence of Arnold Braxton, Jr. The judge making the decision that this should comply with the law must use some modicum of common sense. I mean, when you look at the address and when you look at the closing paragraph, it states, "It is common for persons who have committed armed robberies to store the fruits of their crimes in the place of their residence." It defies common sense to hold that the judge did not infer that this was his residence and that's the basis of my ruling. That's my ruling. Your motion is denied.

In its ruling as to probable cause, it is apparent that the court considered only appellant's contention that the warrant failed to indicate that the targeted premises was appellant's residence. The court did not address appellant's claim that the affidavit lacked a factual basis showing the reason for the affiant's belief that appellant resided at the subject premises.

After the court ruled on other matters, the State proceeded to trial in the homicide case. Following the murder trial, the State called the robbery case for trial. Before commencement of that trial, appellant unsuccessfully renewed his motion to suppress the fruits of the search. In addition, the court heard testimony from Mr. Williams and Detective Gwynn regarding appellant's motion to suppress the pretrial photographic identification on the ground that it was impermissibly suggestive. Braxton also argued for the first time that the affidavit in support of the search warrant was tainted, because Detective Gwynn misrepresented the character of Mr. Williams's identification of appellant. As a result, the court heard additional testimony from Detective Gwynn.

The testimony of Detective Gwynn and Mr. Williams showed that Mr. Williams selected appellant's photograph from a photographic array presented by Detective Gwynn. At that time, the victim stated: "[T]his is the individual. Looks very close to the guy that robbed me." Detective Gwynn then wrote that statement, verbatim, on the back of the photograph of appellant, which Mr. Williams signed. Nevertheless, when Detective Gwynn prepared his affidavit for the search warrant, he did not quote the witness's precise comments. Instead, he characterized the identification in the following words:

The photo array was shown to Mark Williams who positively identified the photograph of Arnold Braxton, BPI # 440492 as the individual who robbed him on April 30, 1996.

Detective Gwynn explained that identifications are ordinarily categorized as either positive or negative. Further, he explained that he considered the witness's degree of confidence with respect to the identification when he stated in his

affidavit that the witness made a "positive" identification. Detective Gwynn said: "[I]t's a matter of semantics as far as the words are concerned. . . . If I would have had an inkling of doubt, then I would not have allowed [Mr. Williams] to sign the photo array."

After considering the detective's testimony as to the taint issue, as well as the earlier testimony of the detective and the victim regarding the photo array, the judge ruled that the detective's use of the words "positive identification" did not taint the affidavit. The judge reasoned:

> I do not find that the use of the word positive was untruthful. I think it is a question of semantics, and in a sense it meshes with the question of bad faith.

> I do not believe from what I've heard that Detective Gwynn used the word positive in order to induce the Judge that signed [the warrant] to issue the search warrant rather than using the words expressed on the back of the photograph because he thought those words were too weak.

> It would not have been my choice of words, but I certainly do not believe that if he merely said identify, that that would have been a mistake in any way.

> Based on the evidence I have heard, he identified Mr. Braxton's photograph. He saw him in court here today and he identified him. That's, it's outside of the scope of this motion, I realize that.

> But Mr. Williams' words, he chooses certain words. Detective Gwynn chooses certain words. I don't think they were the best choice, but I really believe and do find that goes to the weight of the identification.

\* \* \*

> Further to the extent it's necessary, and I doubt that it is, I don't find any bad faith on the part of the detective.

\* \* \*

> If the application for search and seizure warrant had come to me based on the information in the affidavit. . . .

And it said that the photo array was shown to Mr. Mark Williams who stated that Mr. Braxton's photograph looked very close to the guy that robbed me, I would have issued a search warrant. I would have found probable cause.

\* \* \*

I find no taint in the identification.

Accordingly, the judge reaffirmed his ruling denying the motion to suppress the search warrant.

### B. Discussion

### 1. Was the Search Warrant Supported by Probable Cause? [7]

■ The overlapping issue in both the murder and robbery cases concerns the legality of the search warrant for appellant's residence. Appellant posits that the warrant was not based on probable cause because the supporting affidavit failed to specify that the targeted apartment actually was appellant's residence. Even if the affidavit implied that the subject premises was appellant's place of abode, Braxton contends that the affidavit was defective because it lacked any factual foundation to substantiate that assertion.[8] Specifically, Braxton complains that the affidavit was devoid of facts particularizing the basis for the affiant's belief that the targeted

---

**7.** We recognize the discretion of a reviewing court to decide the good faith issue without first resolving the probable cause question. *See United States v. Leon,* 468 U.S. 897, 924–25, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *McDonald v. State,* 347 Md. 452, 469, 701 A.2d 675 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998). Nevertheless, when a suppression motion presents a Fourth Amendment issue "of broad import," or a "novel question of law whose resolution is necessary to guide future action by law enforcement officers" and judges, it is appropriate for the reviewing court to resolve the probable cause issue. *Illinois v. Gates,* 462 U.S. 213, 264, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (White, J., concurring); *see McDonald,* 347 Md. at 475–76, 701 A.2d 675 (Chasanow, J., dissenting).

**8.** In his brief, appellant does not expressly delineate his arguments as two separate theories. We have done so for clarity, however, based on appellant's contentions.

premises was actually appellant's residence. Consequently, appellant insists that the trial court erred in failing to grant his suppression motion.

The State counters that the common sense, non-technical review of affidavits commanded by both the Supreme Court and the Court of Appeals supports the trial judge's decision. The State insists that the issuing judge could "clearly infer" from the affidavit that the premises named in the affidavit was the residence of appellant. Moreover, it characterizes appellant's argument as "hypertechnical." Relying on the recent case of *State v. Ward*, 350 Md. 372, 712 A.2d 534 (1998), the State asserts: " 'Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area.' " *Id.* at 376, 712 A.2d 534 (quoting *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)).

■ Our inquiry with respect to probable cause thus has two prongs. First, we must resolve whether the affidavit adequately identified the targeted premises as appellant's residence. Second, even if the affidavit indicated that the subject premises was appellant's residence, we must decide whether it was nonetheless legally deficient because it failed to articulate any facts demonstrating that appellant lived at the targeted premises.

The Warrant Clause of the Fourth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), proscribes the issuance of any warrant "but upon probable cause, supported by Oath and affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. CONST. amend IV. To be sure, "[a] judicially authorized warrant is the cornerstone of the Fourth Amendment...." *Wiegmann v. State*, 118 Md.App. 317, 347, 702 A.2d 928 (1997), *aff'd*, 350 Md. 585, 714 A.2d 841 (1998). "Article 26 of the Maryland Constitution is *in pari materia* with the Fourth

Amendment." *Birchead v. State,* 317 Md. 691, 700, 566 A.2d 488 (1989) (citations omitted).

Accordingly, absent certain exceptions not applicable here, the police must obtain a search warrant before conducting a search; that warrant must be based upon "sufficient probable cause to justify its issuance as to each person or place named therein." *Ward,* 350 Md. at 387, 712 A.2d 534 (quoting *People v. Easley,* 34 Cal.3d 858, 196 Cal.Rptr. 309, 671 P.2d 813 (1983), *aff'd on reh'g,* 46 Cal.3d 712, 250 Cal.Rptr. 855, 759 P.2d 490 (1988)); *see Connelly v. State,* 322 Md. 719, 726, 589 A.2d 958 (1991). Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see State v. Lee,* 330 Md. 320, 326, 624 A.2d 492 (1993); *Birchead,* 317 Md. at 700, 566 A.2d 488.

The Supreme Court has long recognized that common sense must guide a judge who is asked to grant a warrant request. In *United States v. Ventresca, supra,* 380 U.S. at 108, 85 S.Ct. 741, the Supreme Court said:

If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants ... must be tested and interpreted by magistrates and courts in a commonsense [sic] and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

More recently, in the seminal case of *Illinois v. Gates, supra,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527, the Supreme Court reiterated that "the central teaching of [its] decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.'" *Id.* at 231, 103 S.Ct.

2317 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)). Thus, the issuing judge is

> simply [making] a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Gates*, 462 U.S. at 238, 103 S.Ct. 2317.

Adhering to the preference for a practical approach, the Court of Appeals has advised that in

> reviewing affidavits on a probable cause determination, "when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense [sic], manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."

*Valdez v. State*, 300 Md. 160, 169, 476 A.2d 1162 (1984) (quoting *Ventresca*, 380 U.S. at 109, 85 S.Ct. 741) (citations omitted).

In determining whether probable cause exists, "the issuing judge is confined to the averments contained in the search warrant application." *Birchead*, 317 Md. at 700, 566 A.2d 488 (citations omitted). Moreover, wholly conclusory statements in a warrant application ordinarily will not suffice. *See Gates*, 462 U.S. at 239, 103 S.Ct. 2317 (citing *Nathanson v. United States*, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933) and *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)). To effectuate the preference for warrants, however, great deference is accorded to the issuing judge's determination. *Gates*, 462 U.S. at 236, 103 S.Ct. 2317; *see McDonald v. State*, 347 Md. 452, 467, 701 A.2d 675 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998); *Connelly*, 322 Md. at 727, 589 A.2d 958; *Birchead*, 317 Md. at

701, 566 A.2d 488. Nevertheless, the issuing judge should not function as a mere " 'rubber stamp for the police.' " *Grimm v. State,* 7 Md.App. 491, 493, 256 A.2d 333 (1969) (quoting *Aguilar,* 378 U.S. at 112, 84 S.Ct. 1509). To the contrary, there are limits "beyond which a magistrate may not venture in issuing a warrant", *Gates,* 462 U.S. at 239, 103 S.Ct. 2317, and "[d]eference to the magistrate ... is not boundless." *United States v. Leon,* 468 U.S. 897, 914, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Thus, even a generous, non-technical review of a warrant cannot be used to scuttle the protections of the Fourth Amendment.

■ As the reviewing court, our task is " 'to make a practical common-sense decision whether probable cause exists.' " *McDonald,* 347 Md. at 467, 701 A.2d 675 (quoting *Birchead,* 317 Md. at 701, 566 A.2d 488). This means that we must determine if the judge who issued the search warrant had "a substantial basis for concluding that the evidence sought would be discovered in the place described in the application and its affidavit." *Lee,* 330 Md. at 326, 624 A.2d 492; *see Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984) (reiterating that "the task of a reviewing court is not to conduct a *de novo* determination of probable-cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue a warrant"); *McDonald,* 347 Md. at 467, 701 A.2d 675; *Birchead,* 317 Md. at 701, 566 A.2d 488; *State v. Amerman,* 84 Md.App. 461, 471, 581 A.2d 19 (1990).

Maryland Code (1957, 1996 Repl.Vol.), Art. 27 § 551(a) is also relevant. It provides that a judge may issue a search warrant if the supporting affidavit shows the basis for probable cause. Further, it requires that the search warrant "describe, with reasonable particularity, ... the grounds for such search" of a particular premises. Art. 27 § 551(a).

In this case, it is clear that the affiant did not specifically identify the targeted premises as appellant's residence. Using a common sense, non-technical, and generous construction of the affidavit, however, we are satisfied that it was reasonable

to infer from the affidavit that appellant lived in Apartment 203 at 4310 Seminole Avenue. First, the affidavit identified that address immediately after appellant's name and date of birth. Second, the affiant posited that "[i]t is common for persons who have committed armed robberies to store the fruits of their crimes [and their weapons] in the place of their residence.... It is for this reason that Your Affiant prays that a search and seizure warrant be issued for the above named persons and premises." That particular statement, when coupled with the address mentioned at the outset of the affidavit in conjunction with appellant's name and date of birth, reasonably implied that the affiant sought a warrant for 4310 Seminole Avenue because appellant resided there. In that way, the affidavit also showed a connection between appellant and the targeted address.

It is equally apparent, however, that the affidavit failed to include any facts demonstrating the basis for the affiant's belief that appellant lived at 4310 Seminole Avenue. The question we must answer is whether a police officer's mere assertion as to the suspect's place of occupancy is, standing alone, sufficient to permit a search of that location. In the context of these appeals, we must determine whether the warrant was supported by probable cause even though the affidavit did not contain any factual foundation for the officer's conclusory assertion as to Braxton's place of residence.

In their discussions of the probable cause issue, neither party has provided us with any decisional law that elucidates the issue that we grapple with here. In our research, we have not uncovered any Maryland cases directly on point, but we have found a handful of cases from other jurisdictions that have considered the issue, largely in the context of the good faith exception. We pause to consider one of the cases at this juncture, and we shall discuss others in the context of good faith.

In *United States v. Hove,* 848 F.2d 137 (9th Cir.1988), the court considered the legality of a search warrant for which the supporting affidavit failed to connect the suspect to the target-

ed premises. The appellant, Kimberly Hove, was suspected of sending threatening letters to her ex-husband. *Id.* at 138. An investigation led the police to 2727 DeAnza Road, the residence of appellant's father and the place where the suspect was temporarily living. *Id.* at 139. There, a police officer observed toys in the DeAnza yard and a car in the parking lot; the toys were identified as those of the suspect's child and the car was the suspect's. *Id.* When the affidavit was prepared, however, the law enforcement officer's observations were inadvertently omitted. *Id.*

Although the exact text of the affidavit is not included in the court's opinion, it appears that the affidavit set forth ample facts implicating Ms. Hove in criminal wrongdoing. Nevertheless, the affidavit "never linked Kimberly Hove or any suspected criminal activity in any way with the 2727 DeAnza residence." *Id.* The court observed that the error went unnoticed by the prosecutor who reviewed the affidavit and the magistrate who ultimately approved the search warrant request. *Id.* A panel of the Ninth Circuit, dividing two to one, concluded that the search warrant was not based on probable cause, because the affidavit "simply lists the DeAnza address as a location to be searched." *Id.* at 140. Moreover, "the affidavit ... did not explain the significance or relevance of searching this particular location," *id.* at 139, nor did it offer any "hint as to why the police wanted to search this residence." *Id.* at 139–40.

In reaching its decision, the court focused on the affidavit's failure to "link" the targeted location to Ms. Hove, and its failure to provide "an explanation of why the police believed they may find incriminating evidence there." *Id.* at 140. The court said: "It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence ... will probably be found at the premises to be searched." *Id.*

While *Hove* is facially similar to this case, it is also factually distinguishable in a subtle but important respect. The affidavit in *Hove* merely recited the targeted address, while the

affidavit here recited the address and also impliedly identified the address as appellant's residence. To that extent, the affidavit here linked appellant to the subject premises. In addition, the *Hove* affidavit omitted any explanation as to why the police believed they would recover evidence from the subject premises. In this case, the affiant asserted generally that robbers often store fruits and instrumentalities of crime at their places of occupancy. What the affidavit here did not do is explain why the police believed the particular premises was appellant's residence.

Whatever the differences between *Hove* and the case *sub judice*, *Hove* clearly suggests to us that this case does not concern a mere technical glitch. Moreover, in our view, this case is not governed by those in which courts have upheld search warrants in the face of rather conclusory assertions that fruits and instrumentalities of crime are ordinarily kept in a suspect's residence or car. *See, e.g., Ward,* 350 Md. 372, 712 A.2d 534; *Mills v. State,* 278 Md. 262, 280, 363 A.2d 491 (1976)(upholding search of suspect's residence when weapon was not found on suspect at time of arrest; the residence "was a probable place for secreting [weapon used in commission of crime]."); *United States v. Anderson,* 851 F.2d 727 (4th Cir.1988)(finding probable cause because one could reasonably infer that such evidence would be hidden at suspect's home); *United States v. Jacobs,* 715 F.2d 1343 (9th Cir.1983)(holding it reasonable for magistrate to conclude that articles of clothing could be found at suspect's residence); *United States v. Steeves,* 525 F.2d 33 (8th Cir.1975)(concluding that people who own weapons generally keep them at home); *United States v. Rahn,* 511 F.2d 290 (10th Cir.)(finding it reasonable to assume that individuals store their weapons at home),*cert. denied,* 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). The distinction between this case and the ones we have just mentioned cannot be overlooked; the affidavits in the cases cited above provided a factual basis showing how the suspects were connected to the places that were the objects of the searches.

We turn to consider the recent decision of the Court of Appeals in *Ward,* 350 Md. 372, 712 A.2d 534. There, the

affidavit appended to the search warrant application did not include specific information connecting the particular items sought to be recovered with the places to be searched. In analyzing the legality of the search warrant, the Court focused on the items sought to be seized, and whether the affidavit adequately connected them to the targeted premises. The Court did not address the sufficiency of the link between the suspect and the places to be searched, however, because the affiant articulated a factual basis connecting the suspect to the places to be searched. The affiant averred: " *'The suspect Gary Ward gave the address of 1634 Darley Ave as his home address [when he was questioned by the Homicide Unit]. The vehicle a 1983 Olds Cutless Maryland Tag ZWH075 is listed to Mr. Ward at the 1634 Darley Ave address.' " Ward,* 350 Md. at 375 n. 2, 712 A.2d 534 (emphasis added). The affidavit also set forth a clear factual basis linking the suspect to a murder. The affiant in *Ward* then averred: " 'Your affiant believes that probable cause exists to believe that there is evidence relating to the crime of Murder being stored at 1634 Darley Ave and the 1983 Olds Cutless Maryland Tag # ZWH–075.' " *Id.* It was that assertion that was the centerpiece of the dispute regarding probable cause.

Dividing four to three, the Court upheld the search warrant. The majority found a sufficient nexus between the murder weapon and the places to be searched (the suspect's residence and car) when it considered the reasonable inferences that it believed the magistrate was entitled to draw from the facts that were alleged. *Id.* at 377–78, 712 A.2d 534. Yet even the majority conceded that it was "not a clear cut case and, obviously, it would have been much more helpful had the affidavit contained more detail." *Id.* at 389, 712 A.2d 534. Writing for the majority, Judge Rodowsky explained:

It is self evident that the murder weapon was not found at the crime scene.

The fact that the first of the witnesses who telephoned the police would not identify themselves is significant. These witnesses knew Ward by sight and name. There was no information from any caller that the murderer was a

person other than Ward ... [who] had an arrest record that included two or more handgun "[v]iolations." All of this information permitted the magistrate to infer that these witnesses were unwilling to identify themselves because they feared Ward. The affidavit described Ward, not in terms but in reasonable inference, as a person to whom a handgun and ammunition are items of utility and value. Consequently, the magistrate could infer a reasonable probability that, between the murder and the application for the warrant, Ward had not disposed of the murder weapon ...

The magistrate could further infer that the weapon was not on Ward's person when he was brought in for questioning less than forty-eight hours after the murder ... [T]he police were still looking for the murder weapon when they applied for the warrant. Apparently Ward was accosted when he was in or about his automobile, inasmuch as the police towed that automobile to headquarters while Ward was transported to headquarters by other means. Thus, the weapon was not in plain view in Ward's automobile when the police towed it.

[T]he magistrate had probable cause to believe that the murder weapon and associated evidence of the crime ... could be found in Ward's home and/or in his automobile
. . . .

*Id.* at 377, 712 A.2d 534.

Arguably, the affidavit here did not adequately particularize the fruits and instrumentalities or connect them to appellant's residence. As appellant has not challenged the affidavit on that basis, however, that issue is not before us. Instead, appellant attacks the affidavit on the ground that it only contained a "bare bones" assertion that the subject premises was appellant's residence, and it failed altogether to include any facts demonstrating why the affiant believed that appellant resided at the targeted premises.

In our view, this case is also unlike those that have upheld search warrants, notwithstanding the alleged "staleness" of the probable cause. *See, e.g., Connelly,* 322 Md. 719, 589 A.2d

958; *Peterson v. State,* 281 Md. 309, 379 A.2d 164 (1977), *cert. denied,* 435 U.S. 945, 98 S.Ct. 1528, 55 L.Ed.2d 542 (1978); *State v. Edwards,* 266 Md. 515, 295 A.2d 465 (1972). Relying on *Edwards,* the *Peterson* Court determined that, without regard to time, an affidavit in support of a warrant request may nonetheless indicate "a present violation." *Peterson,* 281 Md. at 316, 379 A.2d 164. Later, in *Connelly,* which concerned an illegal lottery and staleness gambling operation, the appellant urged the Court to reject the application of the good faith exception under *Leon,* on staleness grounds, because the affidavit and application for search warrant were made in November 1988, based on events that had occurred in February 1988. Moreover, the affidavit failed to include the dates of the observations.

In analyzing good faith, the Court accepted the determination that the warrant was not based on probable cause. The Court considered the staleness issue in the context of whether a reasonably well-trained officer would have known the search was illegal, notwithstanding the approval of the warrant request. It observed that there is no requirement "that the facts alleged in the application to establish probable cause must result from observations made within any particular time before the issuance of the warrant." *Connelly,* 322 Md. at 731, 589 A.2d 958 (citing *Peterson,* 281 Md. at 315, 379 A.2d 164). Discussing both *Edwards* and *Peterson,* the *Connelly* Court also recognized that the " 'passage of time' " is not always dispositive, because an affidavit may set forth " 'facts indicating activity of a protracted and continuous nature . . . .' " *Id.* at 731, 589 A.2d 958 (quoting *Peterson,* 281 Md. at 318, 379 A.2d 164). Thus, "the failure of the affidavit to state the time of the events relied upon to show probable cause is not conclusive . . . ." *Id.*

In contrast to the staleness cases, the deficiency that is of concern here is not one that can be cured even when the affidavit is "taken as a whole." *Peterson,* 281 Md. at 321, 379 A.2d 164. Furthermore, the pertinent factors to assess staleness, delineated in *Peterson* and reiterated in *Connelly,* have no application here. These include "whether the criminal

activity was regenerating, the criminal entrenched, and the thing to be seized, while easily transferable, was just as easily replaced." *Connelly,* 322 Md. at 732, 589 A.2d 958.

As we see it, the affidavit in this case is akin to one that fully describes the commission of a crime, but then baldly asserts that the suspect committed the offense, without including any facts showing the basis for that conclusion. *See Collins v. State,* 17 Md.App. 376, 382, 302 A.2d 693 (1973). Manifestly, an affidavit that accuses a suspect of a crime without including the facts supporting that assertion would not demonstrate probable cause to arrest the suspect. *Id.* at 383, 302 A.2d 693. Similarly, an affidavit supporting a search warrant request must show some basis for the belief that the suspect occupies or is otherwise connected to the targeted premises. This is because "probable cause must be shown on the basis of facts rather than mere conclusions." W.R. Lafave, 2 *Search and Seizure* § 3.2.(d), at 57 (3rd ed.1996); *see Connelly,* 322 Md. at 726, 589 A.2d 958 (stating that "the Fourth Amendment demands a factual showing sufficient to comprise probable cause"). Thus, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause; his actions cannot be a mere ratification of the bare conclusions of others." *Gates,* 462 U.S. at 239, 103 S.Ct. 2317.

In construing the affidavit here, the issuing judge first had to infer that the targeted premises was appellant's residence, based on the street address on the face of the affidavit, coupled with the general assertion that criminals typically store fruits and instrumentalities of crime in their residences. Yet the affidavit contained absolutely no clue as to *why* the police believed appellant lived at the particular location identified in the affidavit and warrant application; the affidavit failed to provide a factual basis for the claim that the targeted premises was the suspect's residence. Thus, it did not guard against an unfounded intrusion into one's sanctuary. As the State candidly conceded at oral argument, we may not uphold a warrant merely because the premises turned out to be the

suspect's home. In other words, the ends cannot justify the means.

Accordingly, we hold that the mere identification in the affidavit of appellant's address, without even a single predicate fact showing the basis for the belief that appellant resided at that address, did not establish probable cause to search that location. This is so even if there was otherwise every reason to believe that appellant committed the armed robbery and harbored the fruits and instrumentalities wherever he may have lived. *Cf. State v. Lee, supra,* 330 Md. at 327, 624 A.2d 492 (stating "the veracity *and basis of knowledge* of the informant clearly remain relevant to a probable cause determination") (emphasis added). What Chief Judge Bell said in his dissent in *Ward* resonates here:

> [P]robable cause does not equate to speculation, suspicion, a hunch, or gut-feeling; rather, it is a test of reasonable probabilities based upon the specific facts and information set forth in the warrant ... "[i]f there is one bright star in the Fourth Amendment heaven, it is that probable cause must be shown on the basis of facts rather than mere conclusions."

*Ward,* 350 Md. at 396, 712 A.2d 534 (Bell, J., dissenting) (quoting LaFave, *supra,* § 3.2(d) at 57); *see also Lee,* 330 Md. at 326, 624 A.2d 492.

Given the urgency that is often associated with matters such as this one, we acknowledge that a police officer cannot always prepare the kind of detailed statement that would serve as a textbook example of a model affidavit. But the quantum of facts needed to show the connection between the suspect and the purported place of occupancy is hardly daunting. Typically, an affidavit includes an averment tying the suspect to the targeted location on the basis of surveillance, a check of utility records, verification with a landlord, an address from the phone book, or the like.

Were we to uphold the finding of probable cause in this case, we would cast a long shadow over the Fourth Amendment. To affirm the trial judge's finding of probable cause,

we would have to determine that so long as a street address is specified in the affidavit as the place of residence, that makes it so. Apart from the advantage of hindsight, there is nothing in this affidavit that demonstrated any basis for the belief that appellant resided at 4310 Seminole Avenue. Therefore, we conclude that the affidavit did not comport with the Fourth Amendment's hallmark objective of protecting our citizenry from unreasonable, arbitrary, governmental intrusion.

## 2. Does Good Faith Save This Search Warrant?

Our conclusion that the search warrant was not supported by probable cause does not end our inquiry. We must next determine whether the tangible evidence recovered during the search was nevertheless admissible because the "executing officers acted in objective good faith with reasonable reliance on the warrant." *McDonald,* 347 Md. at 467, 701 A.2d 675; *see Leon,* 468 U.S. at 919–20, 104 S.Ct. 3405; *Massachusetts v. Sheppard,* 468 U.S. 981, 987–88, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984); *Connelly,* 322 Md. at 729, 589 A.2d 958.

At the motion hearing, the State advanced a good faith claim based on *Leon,* 468 U.S. 897, 104 S.Ct. 3405, as an alternative ground to uphold the search warrant. Because the trial court found probable cause, however, it declined to consider the good faith issue. Therefore, no evidence was ever presented below as to the matter. Surprisingly, on appeal, the State has not renewed the good faith contention that it asserted below. In *State v. Lee, supra,* 330 Md. 320, 624 A.2d 492, the Court deemed waived the question of the good faith exception with respect to evidence seized pursuant to a defective warrant, because the State did not raise the issue on appeal. *Id.* at 327 n. 1, 624 A.2d 492. The *Lee* Court did not indicate whether, as in this case, the good faith doctrine was invoked below.

 Even though the trial court did not reach the merits of the good faith claim, we would be able to consider the good faith claim if it were raised on appeal. This is because the question of good faith is a legal one. *McDonald,* 347 Md. at

470 n. 10. In *Connelly, supra,* 322 Md. 719, 589 A.2d 958, the Court recognized that because the "application of the good faith exception to the allegations of the affidavit presents an objectively ascertainable question, it is for the appellate court to decide whether the affidavit was sufficient to support the requisite belief that the warrant was valid." [9] *Id.* at 735, 589 A.2d 958; *see State v. Darden,* 93 Md.App. 373, 397, 612 A.2d 339, *cert. denied,* 328 Md. 447, 614 A.2d 974, *and cert. denied,* 508 U.S. 957, 113 S.Ct. 2459, 124 L.Ed.2d 673 (1992). Accordingly, when the record does not contain a finding as to the good faith question, "we are confined to the language of the affidavit in reviewing the applicability of the good faith exception." *Darden,* 93 Md.App. at 397, 612 A.2d 339.

 Notwithstanding the State's failure to renew its good faith claim, we are satisfied that, in our discretion, we may consider it. Maryland Rule 8–131(a) confers discretion upon the appellate courts to decide issues raised on appeal but not raised below. It also seems to extend to circumstances when the parties have not even raised the issue on appeal. The rule provides, in pertinent part:

> Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.

There are a number of examples of cases in which our appellate courts have resolved an appeal on the basis of a legal issue that was never raised by the parties.

*Taub v. State,* 296 Md. 439, 463 A.2d 819 (1983), is instructive. There, the appellant, a scientist, was convicted of failing

---

**9.** Writing for himself, Chief Judge Bell, and Judge Eldridge, Judge Chasanow suggested in his dissent in *McDonald* that, on the question of good faith, there are circumstances when a remand to the trial court would be appropriate for the purpose of having that court make findings of fact as to the good faith issue. *McDonald,* 347 Md. at 478, 701 A.2d 675 (Chasanow, J., dissenting).

to provide proper veterinary care to six monkeys during the course of his research. Upon reviewing the convictions, the Court concluded that Maryland's animal cruelty statute did not apply to a facility conducting medical research pursuant to a federal program. In reaching that conclusion, the Court acknowledged that its decision was based on an issue that was not raised by the parties. It was, however, discussed at oral argument. *Id.* at 441, 463 A.2d 819. Relying on what was then Md. Rule 813, the Court acknowledged that it occasionally decides cases on the basis of issues "not raised previously." *Id.* It reasoned: "Because our conclusion as to this issue is completely dispositive of the case, we shall consider it." *Id.* at 442, 463 A.2d 819.

That an issue was discussed at oral argument, even though not raised by the parties on appeal, was also significant in *Meyer v. Gyro Transport Systems, Inc.*, 263 Md. 518, 283 A.2d 608 (1971). There, in resolving a question concerning attorney's fees, the Court recognized that a particular legal point had not been raised either below or in the appellate briefs. Nevertheless, because the Court raised the matter during oral argument, it did "not deem it to have been waived." *Id.* at 533, 283 A.2d 608.

*Pope v. Board of School Com'rs,* 106 Md.App. 578, 665 A.2d 713, *cert. denied,* 342 Md. 116, 673 A.2d 707 (1996), also provides authority for an appellate court to consider an issue that has not been raised by the litigants, based on the seminal principle that an appellate court may affirm the trial court "if it reached the right result for the wrong reasons." *Id.* at 591, 665 A.2d 713; *see also State v. Bell,* 334 Md. 178, 638 A.2d 107 (1994); *Robeson v. State,* 285 Md. 498, 403 A.2d 1221 (1979), *cert. denied,* 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980). We expressly said in *Pope* that an appellate court may uphold the lower court even by considering a ground that the circuit court did not rely upon "or one that the parties have not raised." *Pope,* 106 Md.App. at 591, 665 A.2d 713.

In this case, we raised the matter of good faith at oral argument in regard to the robbery case; the parties waived

argument as to the murder case. Moreover, good faith was clearly raised, though not decided, in the lower court. In addition, given our determination that the search warrant was not supported by probable cause, consideration of the issue of good faith may yet result in a conclusion that the trial court reached "the right result for the wrong reasons." *Pope*, 106 Md.App. at 591, 665 A.2d 713. Therefore, we shall exercise the discretion conferred upon us by Rule 8–131(a) and consider the legal question of whether the good faith exception is applicable.

The good faith exception was first announced in 1984 in *United States v. Leon, supra,* 468 U.S. 897, 104 S.Ct. 3405, and the companion case of *Massachusetts v. Sheppard, supra,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737. *Leon* modified the Fourth Amendment exclusionary rule by providing for the admissibility of "evidence seized under a warrant subsequently determined to be invalid ... if the executing officers acted in objective good faith with reasonable reliance on [a facially valid] warrant." *McDonald*, 347 Md. at 467, 701 A.2d 675 (citations omitted); *see Connelly*, 322 Md. at 721, 589 A.2d 958. Notwithstanding the importance of the exclusionary rule to Fourth Amendment jurisprudence, the Supreme Court determined that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Leon,* 468 U.S. at 918, 104 S.Ct. 3405; *McDonald,* 347 Md. at 468, 701 A.2d 675. In *Sheppard,* 468 U.S. at 989–90, 104 S.Ct. 3424, the Court added: "[W]e refuse to rule that an officer is required to disbelieve a judge who has just advised him ... that the warrant he possesses authorizes him to conduct the search he has requested."

To be sure, *Leon* made clear that there are circumstances when exclusion of evidence remains the appropriate sanction, even if an officer "has obtained a warrant and abided by its terms." *Leon,* 468 U.S. at 922, 104 S.Ct. 3405. This is because "the officer's reliance on the magistrate's probable-cause determination ... must be objectively reasonable, and it

is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922–23, 104 S.Ct. 3405 (citations and footnotes omitted).

The *Leon* Court recognized four situations when the sanction of exclusion is an appropriate remedy. Two of them may be applicable here. The Supreme Court indicated that an officer does not "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 923, 104 S.Ct. 3405 (citations omitted). Further, the Court said that executing officers cannot reasonably presume that a warrant is valid if it is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized . . . ." *Id.*

As a corollary, we note that mere presentation of a warrant to a judicial officer does not necessarily protect a police officer from civil liability. *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). *Malley* is illuminating in regard to its analysis of *Leon.* It is also instructive in understanding what is required of a police officer who prepares an affidavit for a warrant.

In *Malley,* a state judge signed arrest warrants presented by a State trooper. *Id.* at 338, 106 S.Ct. 1092. After the grand jury failed to return indictments, the arrestees brought suit in federal court, alleging that the trooper violated their rights under the Fourth and Fourteenth Amendments of the federal constitution when he applied for the arrest warrants. *Id.* The Supreme Court determined that the objective reasonableness standard enunciated in *Leon* applies when an officer's request for a warrant results in an unconstitutional arrest and a subsequent damages action instituted under 42 U.S.C. § 1983. *Id.* at 344, 106 S.Ct. 1092. It reasoned that a qualified immunity defense adequately protects "all but the plainly incompetent or those who knowingly violate the law," *id.* at 341, 106 S.Ct. 1092, and it gives "ample room for mistaken judgments." *Id.* at 343, 106 S.Ct. 1092. On the

other hand, if "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable", then no immunity is available. *Id.* at 344–45, 106 S.Ct. 1092. The Court further explained that police officers "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* at 341, 106 S.Ct. 1092.

Significantly, the *Malley* Court squarely rejected the contention that so long as the officer believes that the facts alleged in the affidavit are true, and presents the warrant application to a judicial officer, "the act of applying for a warrant is *per se* objectively reasonable," *id.* at 345, 106 S.Ct. 1092, thereby shielding the officer from liability. The Court characterized such an argument as an effort to "excuse [the officer's] own default by pointing to the greater incompetence of the magistrate." *Id.* at 346 n. 9, 106 S.Ct. 1092. Recognizing that the important "question . . . is whether a reasonably well-trained officer . . . would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant," *id.* at 345, 106 S.Ct. 1092, the Court reasoned that a police officer ultimately is responsible for his or her own actions, regardless of the error of a magistrate in approving the warrant request. The *Malley* Court explained:

> It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

*Id.* at 345–46, 106 S.Ct. 1092. The Court further stated: "[A] damages remedy for an arrest following an objectively unreasonable request for a warrant imposes a cost directly on the officer responsible for the unreasonable request . . . ." *Id.* at 344, 106 S.Ct. 1092.

■ In *Minor v. State*, 334 Md. 707, 641 A.2d 214 (1994), the Court of Appeals relied on both *Malley* and *Leon* in its consideration of the good faith exception. It recognized that "the question is whether a reasonably well-trained officer would have known 'that his affidavit failed to establish probable cause....'" *Id.* at 715, 641 A.2d 214 (citation omitted). As the *Minor* Court explained, it is not a matter of a police officer's "second guess[ing]" the judge. *Id.* Rather, the officer has a duty "to withhold from presentation an application for a warrant that a well-trained officer would know failed to establish probable cause." *Id.* Accordingly, notwithstanding "authorization" from a judge to conduct a search, good faith does not apply if a "reasonably well trained officer would have known that the search was illegal...." *Leon*, 468 U.S. at 922 n. 23, 104 S.Ct. 3405.

■ It is also noteworthy that when, as here, many officers actually participated in the search, but not all participated in obtaining the warrant, the search cannot be upheld merely because some of the officers who executed the warrant had no knowledge of its legal deficiencies. The objective reasonableness test is applied only to the officers who actually procured the warrant; it is measured as of the time of the warrant application. LaFave, *supra, 1 Search and Seizure* § 1.3(f), at 90. As LaFave points out, "'when the Court speaks of the good faith of the police, it is talking about their good faith *before going* to the magistrate and not about their good faith *after* they have received the warrant....'" *Id.* n. 115 (quoting Bradley, *"The Good Faith Exception" Cases: Reasonable Exercise in Futility*, 60 Ind. L.J. 287, 297 (1985)). LaFave notes:

> Were it otherwise, an officer or agency possessed of facts insufficient to establish probable cause could circumvent the Fourth Amendment by the simple device of directing or asking some other officer or agency to make the arrest and search.

LaFave, § 3.5(b) at 255–56.

With these principles in mind, we turn to explore the undergirding question of whether a reasonably well-trained

officer would have known that the affidavit in issue here was legally deficient because it did not include any facts to show that the targeted premises was appellant's residence. We pause to ascertain what is meant by the phrase "a reasonably well-trained officer."

In *United States v. Hale*, 784 F.2d 1465, 1470 (9th Cir.1986), the Ninth Circuit recognized that a reasonably well-trained officer is required to know "well-established current law." Similarly, in *United States v. Savoca*, 761 F.2d 292, 297 (6th Cir.), *cert. denied*, 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985), the Court suggested that a reasonably well-trained officer would be aware of relevant court decisions. In much the same way, in his dissent in *Minor*, Chief Judge Bell posited, *inter alia*, that such an officer is "chargeable . . . with knowing what the Fourth Amendment prohibits: both unreasonable searches and seizures and the issuance of warrants except on probable cause." *Minor*, 334 Md. at 724, 641 A.2d 214 (Bell, J., dissenting). He also suggested that a reasonably well-trained police officer must know that wholly conclusory assertions in an affidavit are insufficient to constitute probable cause. *Id.* at 725, 641 A.2d 214. We do not quarrel with any of these descriptions of a reasonably well-trained police officer.

In light of these concepts, we next consider whether a reasonably well-trained police officer would know that an affidavit in support of a search warrant application must contain a factual foundation to support an assertion that the suspect occupies or is otherwise connected to the targeted premises. As we noted earlier, we have found only a few cases that discuss the question of whether an affidavit must show such a factual predicate. Arguably, the lack of decisional law suggests that it is elementary that an affidavit must contain the requisite factual foundation, and therefore only a few reported cases have considered such a rudimentary concept. Stated otherwise, even a rookie officer would know that, to justify the search of a suspect's residence, an affidavit must set forth some factual basis showing that the suspect resides at the purported residence. Conversely, the decisional void

might support the view that even a well-trained officer would not know that an affidavit must include a factual basis demonstrating how the suspect is connected to the targeted premises.

The case of *United States v. Procopio,* 88 F.3d 21 (1st Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1008, 136 L.Ed.2d 886 (1997), is particularly helpful in our analysis of the issue we confront. There, three defendants were convicted of various offenses arising out of the armed robbery of an armored truck, in which $1.2 million in cash was stolen. On appeal, two of the defendants complained, *inter alia,* about the search of one defendant's residence at 81 Intervale Street in Brockton, Massachusetts, because the police had erroneously obtained a search warrant for 79 Intervale Road. *Id.* at 28. When the police went to the address indicated in the warrant, they discovered that it was incorrect. *Id.* As a result, a federal agent on the scene asked another agent to prepare a new warrant application for the correct address. *Id.* In the second affidavit, the affiant indicated that she had talked to the agent on the scene, who was at the suspect's address at 81 Intervale, and she was advised that "the correct address for [the defendant's] residence was 81 Intervale Road, Brockton, MA. rather than 79 Intervale Road as listed in the original application and warrant." *Id.* Nevertheless, the warrant application failed to include any specific information as to the correct address, even though, through surveillance, the agent at the scene saw the suspect in an apartment at 81 Intervale.

The First Circuit noted that "the only omission was the failure to explain how the agent—who had ample basis for the contention—knew that '81 Intervale' was '[the suspect's] address.'" *Id.* Because the deficiency in the *Procopio* affidavit is comparable to the flaw in the affidavit here, what the First Circuit said is particularly pertinent:

> The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business. That hardly makes the address unimportant; to invade the wrong location is a serious matter. But so long as the affidavit itself

asserts a link between the suspect and the address, it is easy to understand how both the officer applying for the warrant and the magistrate might overlook a lack of detail on a point often established by the telephone book or the name on the mailbox.

*Procopio,* 88 F.3d at 28.

Notwithstanding the factual omission, the *Procopio* court concluded that the good faith exception applied, because the defect was "hardly blatant" and there was no suggestion of bad faith. *Id.* In reaching its conclusion, the court observed that the agent on the scene advised that he was at the suspect's address at 81 Intervale. "Thus, the affidavit included the agent's assertion that the address to be searched (81 Intervale) was that of the suspect ... as to whom probable cause had been shown." *Id.*

The case of *United States v. Brown,* 832 F.2d 991 (7th Cir.1987), *cert. denied,* 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 243 (1988), is also instructive, because the content of the disputed affidavit there is comparable to the one at issue here. The defendant in *Brown* challenged the denial of his motion to suppress, complaining that the affidavit did not establish probable cause to search because it failed to indicate "how the police knew that the Westminster Apartment was truly one of [the defendant's] addresses." *Brown,* 832 F.2d at 994. On its face, the affidavit listed the defendant as the lessee, but the Seventh Circuit agreed that it was deficient because it failed to reveal how the police knew that the defendant was the lessee of the targeted address. *Id.* at 995. The court acknowledged that if the "affidavit had shown that this address was truly [the defendant's] and had been one of his mail-drops, there of course would have been probable cause." *Id.* at 994. Notwithstanding the lack of probable cause, however, the court concluded that the police officers reasonably relied on the warrant. *Id.* at 995–96. Thus, it held that the good faith exception applied. In reaching that decision, the court considered, *inter alia,* that the affidavit incorporated an earlier, exhaustive affidavit that had been offered in connection with a search warrant for a different

location. *Id.* at 995. Moreover, there was no evidence that the magistrate had been purposefully misled by the police.[10] *Id.*

*State v. Varnado,* 675 So.2d 268 (La.1996), is also noteworthy. There, the defendant moved to suppress evidence obtained pursuant to a search warrant, because the affidavit failed to indicate that the targeted location was actually the defendant's residence. The defendant also complained that the warrant application did not provide a specific factual basis linking the residence to the items sought in the search.

The *Varnado* court recognized that the police had probable cause to search the defendant's residence. But, sounding a now familiar chord, the court found "a critical omission in the warrant application," because it failed "to identify the targeted premises as the defendant's residence." *Id.* at 270. Nonetheless, because the exclusionary rule is intended to deter police misconduct, not to punish the mistakes of judges, the court concluded that, "under the particular circumstances of this case, application of the exclusionary rule would serve no remedial purpose." *Id.* The court reasoned that "[t]he officer had no apparent purpose for omitting the information linking the defendant to the residence ...." *Id.* at 271. Indeed, the court believed that another officer in the same position "would not have noticed the defect ...." *Id.*

Returning to *Hove,* 848 F.2d at 137, which we discussed earlier in the context of probable cause, the Ninth Circuit declined to apply the good faith exception. *Id.* at 140. The panel majority was clearly troubled by the fact that the affidavit simply listed the address to be searched, without connecting it to the suspect. Although the investigating officer in *Hove,* like Detective Gwynn, knew more facts than were included in the affidavit, the court said that "*Leon* does not

---

**10.** The *Brown* court also determined that the defendant failed to show that a well-trained officer would have known that the search was illegal. *Brown,* 832 F.2d at 995. Because appellant did not have an opportunity below to present evidence or develop the record, we shall not rely on this aspect of the *Brown* decision for our good faith analysis.

extend ... to allow the consideration of facts only known to an officer and not presented to the magistrate." *Id.* Moreover, the court reasoned that the "obviously deficient affidavit cannot be cured by an officer's later testimony on his subjective intentions or knowledge." *Id.* Thus, the court agreed with appellant that "the good faith exception to the exclusionary rule should not save the search ... because the affidavit was so deficient that official belief in the existence of probable cause would be entirely unreasonable." *Id.* at 137.

Unlike in *Hove*, the affidavit here connected the targeted address and appellant, because the affidavit reasonably implied that the targeted premises was appellant's residence. In contrast, the deficiency in *Hove* involved the failure of the affidavit to explain the relevance of the targeted address or its connection to the suspect. That is not the same deficiency that concerns us.

Under the circumstances attendant here, we are persuaded by those cases applying the good faith doctrine. We explain.

In our consideration of the flaw in this affidavit, we are mindful that we have not found any Maryland case that mandates the need to include the kind of factual predicate that is missing from this affidavit.[11] Consequently, although it would seem elementary that an affidavit should contain some factual basis linking the suspect to the targeted location, we cannot say that the detective here was alerted to such a requirement. Indeed, the dearth of case law on this point might also explain why the judge who ultimately issued the search warrant apparently failed to inquire about the affidavit's deficiency. Certainly, had the issuing judge asked the detective about the factual basis for his assertion that appel-

---

**11.** In *Davis v. DiPino*, 121 Md.App. 28, 708 A.2d 357 (*en banc*), *cert. granted*, 350 Md. 488, 713 A.2d 980 (1998), the Court's majority concluded, *inter alia*, that the defendant was unlawfully arrested for the offense of hindering a police officer, because the arrest was not based on probable cause. In contrast to the case *sub judice*, however, we looked to Maryland decisional law, *i.e*, *Cover v. State*, 297 Md. 398, 466 A.2d 1276 (1983), in determining a lack of probable cause. *Id.* at 52–57, 708 A.2d 357.

lant resided at the targeted address, the detective could have supplemented his affidavit with a statement that he obtained appellant's address from his arrest record, thereby curing the factual deficiency.

In our good faith analysis, we also consider it significant that the affidavit set forth ample probable cause linking appellant to the armed robbery. Further, by inference, the affidavit identified the targeted address as appellant's residence and, as appellant concedes, there was probable cause to search appellant's residence, wherever it may have been. The gap essentially concerned an intermediate premise; the affidavit failed to include any fact supporting the affiant's assertion that appellant resided at the targeted address. Yet we cannot overlook that appellant's arrest record provided the detective with a valid basis to believe that appellant resided at the premises in question. Thus, the officer's error was one of omission; there was no suggestion that the detective purposefully failed to disclose the information or otherwise acted in bad faith.

To be sure, the Supreme Court has made clear that a police officer is responsible for his or her own actions. Thus, a judge's mistake in issuing a warrant does not necessarily excuse an officer's error in presenting the request for a warrant. *See Davis v. DiPino,* 121 Md.App. 28, 77–78, 708 A.2d 357 (*en banc*), *cert. granted,* 350 Md. 488, 713 A.2d 980 (1998).[12] But the issuing judge's apparent failure here to notice the factual deficiency suggests to us that the officer's

---

12. *Davis* is readily distinguishable from this case. After the appellant in *Davis* was arrested for the crime of hindering, the State dismissed the charges. The appellant then initiated suit against several defendants, including the police officer who applied for the statement of charges that culminated in appellant's arrest. Appellant alleged, *inter alia,* a violation of his civil rights. Although we concluded that there was no probable cause for the appellant's arrest, we were not presented with a good faith issue under *Leon.* In this case, even though we conclude that the search warrant was not supported by probable cause, we are not presented with the question of whether Mr. Braxton is entitled to pursue a civil claim against Detective Gwynn, and we express no opinion as to that matter.

error was "hardly blatant." *Procopio*, 88 F.3d at 28. To the contrary, it seems clear that the detective believed he was authorized to conduct the search pursuant to a valid warrant.

 Therefore, we conclude that the officer who procured the search warrant, and those who executed it with him, acted in objective good faith. Accordingly, we hold that the good faith doctrine first enunciated in *Leon* governs the disposition of this issue. Thus, we decline to impose the drastic sanction of exclusion, as that would be entirely disproportionate to any police oversight, and would not serve the ends of justice.

### 3. Was the Affidavit Tainted Due to Police Misrepresentation?

Appellant argues that the search warrant was tainted because, in the affidavit, Detective Gwynn misrepresented the strength of the witness's identification made during the photo array.[13] Without that identification, Braxton contends that the affidavit is insufficient to support a finding of probable cause.

Detective Gwynn averred in his affidavit that Mr. Williams positively identified Braxton as the robber. In actuality, Mr. Williams said, "this is the individual. Looks very close to the guy that robbed me." Confronted with appellant's allegation, the court heard testimony from Detective Gwynn concerning his statement in the affidavit. Thereafter, the trial court determined that Detective Gwynn's characterization of the witness's identification did not constitute intentional or reckless disregard for the truth. Relying upon *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), however, appellant urges that the trial court erred.

In *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674, the Supreme Court said:

---

13. In regard to the murder case, appellant did not raise this issue until after trial, when he submitted his motion for new trial. Thus, with respect to Trial I, the State argues that the taint claim is not preserved. Because we conclude that appellant's complaint has no merit, we need not resolve the preservation issue.

[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

The movant must also show, by a preponderance of the evidence, that the affiant's misstatement of fact was knowing, intentional, or made with reckless disregard for the truth. *Franks,* 438 U.S. at 155, 98 S.Ct. 2674.

 We review the trial court's factual findings under a clearly erroneous standard. *See Wilson v. State,* 87 Md.App. 659, 668, 591 A.2d 524 (1991)(holding "that the trial court was not clearly erroneous in finding that there was no basis for the suppression of the evidence"). In *Jones v. State,* 343 Md. 448, 682 A.2d 248 (1996), the Court observed:

When facts are in dispute, deference is paid to the trial court, that is, its findings of fact are accepted unless they are clearly erroneous. In making the latter determination the court must give "due regard to the opportunity of the trial court to judge the credibility of the witnesses."

*Id.* at 457–58, 682 A.2d 248 (quoting Md. Rule 8–131(c)).

 We are amply satisfied that the trial court's findings were not clearly erroneous. In contrast to the cases that appellant relies upon in his brief, Detective Gwynn did not admit to any deliberate falsehoods. *See, e.g., United States v. Bennett,* 905 F.2d 931, 934 (6th Cir.1990)(holding that "[b]ecause [the police officer], by his own testimony, admitted that the statements in his affidavit were untrue ... the district

court's determination that there were no intentionally false statements ... was clearly erroneous."). Moreover, Judge Alpert was certainly entitled to credit the officer's explanation. Accordingly, we agree with the trial judge that this dispute was largely a matter of semantics.

The case of *United States v. Waxman*, 572 F.Supp. 1136 (E.D.Pa.1983), further suggests to us that the officer's characterization was of no legal significance in the context of this case. In *Waxman*, the court described as "positive and certain" the identification of the suspect by two witnesses who looked at a photo array, even though one witness stated that she was only eighty-five percent sure and the other witness identified the suspect in one of the photographs but rejected two other photos depicting the same man. *Waxman*, 572 F.Supp. at 1141. The court observed: "While absolute certainty of an identification is ideal, it is unnecessary during the investigative stage. Rather law enforcement officers must deal with *probabilities*." *Id.*

## III. Trial I [14]

### A. Factual Summary

At approximately 1:35 a.m. on April 26, 1996, Officer Christopher Belcher discovered a body slumped over the steering wheel of a car that had crashed into a fire hydrant on Beaumont Avenue in Baltimore City. The victim, Melvin Alexander, Jr., suffered a gunshot wound to the head and was

---

**14.** In the murder trial, three indictments were consolidated for trial. Case No. 19616504 involved a three count indictment charging the following:. first degree premeditated murder; unlawful use of a handgun in the commission of a felony or a crime of violence; and unlawful wearing, carrying, or transporting a handgun in violation of Art. 27 § 36B(b). Case No. 196165049 contained a five count indictment charging attempted armed robbery; assault with intent to rob; assault; unlawful wearing, carrying or transporting a handgun; and unlawful use of a handgun in the commission of a felony or crime of violence. Case No. 196165050 contained a three count indictment charging attempted armed carjacking; unlawful use of a handgun in the commission of a felony or crime of violence; and unlawful wearing, carrying, or transporting a handgun.

pronounced dead at the scene. The officer recovered the victim's wallet, which had no money in it.

William Peters, a crime lab technician, testified that, during the investigation at the scene, he recovered one .25 caliber cartridge casing from the passenger side door of the vehicle, one cartridge case from the street, and a bullet fragment on the street, about 70 feet behind the car. Lisette Rivera, also of the crime lab, processed the car and recovered two cartridge casings from the passenger side floor mat. She also processed the vehicle for fingerprints.

The medical examiner's investigation indicated that Mr. Alexander had been killed approximately five days before his body was discovered. The autopsy revealed that the victim actually suffered four gunshot wounds: one on the right side of the head, another just behind it on the lower portion of the head, one on the anterior of the neck, and one in the middle of the thigh. Stephen Radentz, M.D., an expert in forensic pathology, recovered three bullets from the victim's body during the autopsy. He testified that the victim was killed by one of the gunshot wounds to the head.

Detective Gwynn testified that he executed a search warrant at 4310 Seminole Avenue, Apt. 203, which was the residence of Claudette Cook, Starr Braxton, and appellant. During the search of the front bedroom, he stated that the police recovered papers with appellant's name on them, some cellular phones, and some pagers. In addition, a .25 caliber handgun was recovered from under a pillow on the bed. Further, the police recovered a black holster, one magazine, a single round of ammunition, and six additional rounds of ammunition.

Jack Wagster, Jr., the State's expert witness in firearms identification, opined that two of the bullets discovered at the scene of the homicide were fired from the .25 caliber gun recovered from appellant's residence.[15] The court reserved

---

15. Wagster also explained that the other bullets and cartridge casings lacked sufficient microscopic markings to make a determination as to whether they were fired from the same gun.

ruling on appellant's objection to Wagster's testimony that the .25 caliber gun met the definition of a handgun under Maryland Law. *See* Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 36(F)(b). Appellant never moved to strike the challenged statements before the close of all the evidence, nor did he ask the court to revisit the issue and make a ruling.

Lorraine Lansey, an expert in latent fingerprint examinations, also testified for the State. She opined that a fingerprint lifted from the exterior surface of the passenger side front door window of the vehicle in which the victim was shot matched the left index finger of appellant. No fingerprints were discovered on the gun, however.

Appellant did not present a defense case. Appellant's counsel moved for judgment of acquittal as to all charges, arguing that the State failed to prove a *prima facie* case of carjacking and attempted armed robbery. Defense counsel concluded by stating that "as to all counts of all the indictments I would argue the State had failed to make a *prima facie* case as to criminal agency."

The court overruled the motion as to the murder case, based on the evidence of the fingerprint, the recovery of the handgun from appellant's residence, and the ballistics test. The court also denied the motion as to the attempted carjacking, concluding that a reasonable jury could infer from the State's evidence that the person who killed the victim was attempting to take control of the car. Nevertheless, the judge deemed the handgun charge in connection with the attempted carjacking charge as redundant, because it arose from the same facts as the handgun charge in the murder case. The court granted appellant's motion for judgment of acquittal in regard to attempted armed robbery, assault with intent to rob, and the handgun charges related to the robbery and carjacking charges.

The jury convicted appellant of first degree murder; unlawful use of a handgun in the commission of a felony or crime of violence; and unlawful wearing, carrying, or transporting a

handgun. Braxton was found not guilty of attempted carjacking and second degree murder.

In his motion for new trial, appellant renewed his challenge to the legality of the search warrant. As we noted earlier, he also complained for the first time that the affidavit was tainted due to Detective Gwynn's mischaracterization of the witness's pretrial identification of appellant. In addition, appellant argued that the evidence was insufficient to sustain the murder conviction. Appellant also contended that the guilty verdict as to first degree murder was inconsistent with the jury's finding of not guilty as to second degree murder. In this regard, he said: "Second degree murder is of course a lesser included offense of first degree murder. You can't have first degree murder if you don't have second degree murder." The judge denied the motion.

We will include additional facts in our discussion of the issues.

## B. Discussion

### 1. Did the court err in permitting the expert to testify that the weapon was a handgun?

Appellant complains that the trial judge improperly allowed Wagster, the expert firearms examiner, to testify that the weapon recovered from appellant's residence constituted a handgun under Maryland law. He argues that such testimony constituted a legal conclusion, and thus it improperly invaded the province of the jury. We disagree.

The following exchange is relevant:

[THE STATE]: Mr. Wagster, does that weapon that you examined meet the definition of a handgun that is set out in Maryland law.

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Overruled.

[WAGSTER]: Yes sir, it does. Yes ma'am it does.

[THE STATE]: And how did you draw that conclusion?

[WAGSTER]: That it was test-fired and examined to be operable.

[APPELLANT'S COUNSEL]: Objection. Move to strike.

THE COURT: I'll reserve ruling on that.

[THE STATE]: Did you fire it?

[WAGSTER]: Yes, I did.

[THE STATE]: And did you find that it was operable?

[WAGSTER]: Yes, I did.

[THE STATE]: And what does the term "operable" mean?

[WAGSTER]: That it, in fact, fired a live cartridge, discharged a projectile down the barrel.

 At the outset, we conclude that this issue is not preserved, because, after the court reserved ruling, appellant never asked the court to rule. *See* Md. Rule 4–323(a). In *Davis v. State,* 189 Md. 269, 274, 55 A.2d 702 (1947), the Court said:

[W]here a defendant objects to the admission of evidence, and the Court, instead of making a definite ruling thereon, admits the evidence subject to exception, the record, to be sufficient for the basing of reversible error thereon, must show that the ruling was made or sought before the close of the case. We cannot add to the record by assuming that the attorney for the defense moved to strike out the paraphernalia in evidence before the close of the case and the trial court thereupon ruled on the question.

\* \* \*

As the Criminal Court did not rule on the objection to the admissibility of the lottery paraphernalia, the appeal from the judgment must be dismissed.

(Citations omitted).

Even if the issue were preserved, however, it lacks merit. We explain.

 "It is well settled that 'the admissibility of expert testimony is a matter largely within the discretion of the trial

court, and its actions in admitting or excluding such testimony will seldom constitute a ground for reversal.'" *Oken v. State,* 327 Md. 628, 659, 612 A.2d 258 (1992), *cert. denied,* 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993) (quoting *Stebbing v. State,* 299 Md. 331, 350, 473 A.2d 903, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984)); *see Sippio v. State,* 350 Md. 633, 648, 714 A.2d 864 (1998). "[T]he standard for the admissibility of expert evidence is whether the finder of fact can receive appreciable help from an expert on the subject matter." *Cook v. State,* 84 Md.App. 122, 138, 578 A.2d 283 (1990) (citations omitted); *see Sippio,* 350 Md. at 649, 714 A.2d 864. Nevertheless, an expert's opinion is inadmissible when it "encroache[s] on the jury's function to judge the credibility of the witnesses and weigh their testimony and on the jury's function to resolve contested facts." *Bohnert v. State,* 312 Md. 266, 279, 539 A.2d 657 (1988).

In *Bohnert,* the Court held inadmissible an opinion of a social worker, who testified as an expert in a child sexual abuse case that the victim was sexually abused. *Id.* at 271, 539 A.2d 657. Because there was no corroborating physical evidence of the crime, the State's case "hinged solely" on the testimony of the child victim. *Id.* at 270, 539 A.2d 657. Thus, the Court concluded that the expert's testimony usurped the jury's function to assess the credibility of the witnesses. It reasoned: "The opinion of [the expert] that [the child] in fact was sexually abused was tantamount to a declaration by her that the child was telling the truth and that [the defendant] was lying." *Id.* at 278–79, 539 A.2d 657. Similarly, in *Cook,* 84 Md.App. 122, 578 A.2d 283, the officer rendered an opinion as to each defendant's role in a particular organization. *Id.* at 135–36, 578 A.2d 283. Because such testimony was tantamount to an assertion that the defendants were guilty, the Court held that the officer's testimony was improperly admitted. *Id.* at 137, 578 A.2d 283. Unlike in *Bohnert* or *Cook,* Wagster's testimony did not amount to a conclusion regarding the ultimate issue of appellant's guilt or the credibility of any witness, much less a key witness for the State.

Moreover, under Maryland law, the definition of a handgun is complicated. *See Mangum v. State,* 342 Md. 392, 395–97, 676 A.2d 80 (1996) (stating that to define a handgun one must refer to several interlocking subsections of the statute in which a number of terms are defined by cross-references). Indeed, the topic illustrates the proposition that " '[t]he distinction between fact and opinion is often difficult to draw.' " *Goren v. U.S. Fire Ins. Co.,* 113 Md. App. 674, 686, 688 A.2d 941 (1997) (quoting Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 603(B), at 330 (1993)).

In *Mangum,* 342 Md. 392, 676 A.2d 80, the Court explained that the "broad statutory strokes" in Md.Code (1957, 1992 Repl.Vol., 1995 Cum.Supp.), Art. 27 § 36B(b) and § 36F(b)– (g), "do not fully explicate Maryland's prohibition against carrying, possessing, or transporting a handgun." *Id.* at 396, 676 A.2d 80. Further, the Court observed that "a 'handgun,' as contemplated within the meaning of § 36F(b) and § 36B(b), must also be a 'firearm.' " *Id.* (citation omitted). A firearm must propel a missile by gunpowder or another kind of explosive. *Id.* at 397, 676 A.2d 80. Moreover, to sustain a conviction pursuant to Art. 27 § 36B(b), the State must prove, at least circumstantially, that the handgun was operable. *Id.* at 397, 676 A.2d 80.

Other courts that have considered similar issues have permitted expert testimony much like that which is challenged here. *See, e.g., United States v. Buchanan,* 787 F.2d 477, 483 (10th Cir.1986)(permitting expert to testify that certain weapons fit the statutory descriptions of weapons required to be registered with the Bureau of Alcohol, Tobacco, and Firearms); *United States v. McCauley,* 601 F.2d 336 (8th Cir.1979)(holding that it was not an abuse of discretion to allow expert testimony that the gun in evidence was a machine gun within the meaning of the registration statute, 26 U.S.C § 5861(d) (1982)). In *Buchanan,* 787 F.2d 477, the Tenth Circuit observed that the expert's testimony was particularly helpful because "[t]he question before the jury involved the consideration of a particular homemade device against an array of statutory definitions." *Id.* at 483. In *McCauley,* 601

F.2d 336, the Eighth Circuit relied on F.R.Ev. 704, from which Md. Rule 5–704(a) is derived, and held that the challenged opinion testimony was "not objectionable merely because it embraces an ultimate issue of fact to be decided by the trier of fact." *Id.* at 339.

Considering the complexities of what constitutes a handgun, as opposed to some other type of firearm, this was surely the kind of subject matter for which an expert would be helpful to the jury. Wagster was amply qualified as an expert; he had previously examined over 1000 firearms and testified as an expert over 119 times. Moreover, in his instructions to the jury, Judge Alpert explained that the jury did not have to credit an expert's opinion. He said: "You should give expert testimony the weight and value you believe it should have. You are not required to accept any expert's opinion. You should consider an expert's opinion together with all of the other evidence." In view of the foregoing, we conclude that the court did not abuse its discretion in permitting the expert to opine that the weapon involved here was a handgun within the meaning of Maryland law.

## 2. Was Appellant Prejudiced When the Court Allowed the Jury to Consider the Attempted Carjacking Charge?

At the close of evidence, appellant moved for judgment of acquittal as to the attempted carjacking charge, complaining that there was no proof that the assailant attempted to take the victim's vehicle. Although the court denied the motion, the jury later acquitted appellant of the attempted carjacking charge. Nonetheless, appellant contends that the erroneous submission of the carjacking offense tainted the jury's consideration of the other charges.

To support his contention that the court erred in submitting the carjacking charge to the jury, appellant argues that "to infer that the gunman shot [the murder victim] to obtain control or possession of the car would be mere speculation." Appellant posits that if one takes the trial court's rationale for denying his motion to its logical end, a jury could consider a

carjacking charge whenever someone is shot in a car. Although appellant concedes that the jury's acquittal as to the carjacking count renders harmless any error in submitting that charge to the jury, he claims that the error had a prejudicial impact on the jury's decision with respect to the murder charge.

We need not resolve whether the court erred in allowing the jury to consider the attempted armed carjacking charge. Even assuming that the court erred, it does not follow that the error infected the murder conviction.

To begin with, we cannot ignore the jury's acquittal of appellant for attempted carjacking. In *Comi v. State*, 26 Md.App. 511, 338 A.2d 918 (1975), we held that although the court erred in submitting a particular robbery charge to the jury, the fact that the jury returned a not guilty verdict as to that count protected against any reversible error. *Comi*, 26 Md.App. at 520–21, 338 A.2d 918. The Court was unwilling to conclude that, because the jury had improperly received one of fourteen robbery charges, the other thirteen charges were automatically tainted.

Moreover, there is nothing in the record to indicate that, in acquitting appellant of attempted armed carjacking, the jury was somehow improperly influenced in its verdict as to the murder conviction. To the contrary, the jury's disposition of the carjacking charge suggests that it carefully considered the evidence and the judge's instructions as to the law. Further, the evidence with regard to the carjacking and murder charges was precisely the same. Therefore, this is not a case in which the jury was prejudiced by hearing evidence that it otherwise would not have heard, but for the court's decision to permit the carjacking case to go to the jury.

*Sherman v. State*, 288 Md. 636, 421 A.2d 80 (1980), on which appellant relies, is factually inapposite. There, the judge granted a motion for judgment of acquittal as to three of five offenses charged in the indictment. *Id.* at 637, 421 A.2d 80. Nonetheless, the indictment, including the "dead counts", was erroneously submitted to the jury, in violation of what was

then Md. Rule 758(a). *Id.* at 637–38, 642, 421 A.2d 80. In contrast, the jury here did not consider a "dead count," because the court did not deem the carjacking charge as dead. Additionally, in *Sherman,* one of the counts erroneously submitted to the jury pertained to willful commingling of certain funds. Because the defendant was eventually convicted of commingling other funds, the court could not conclude that the jury was not influenced to convict the defendant of commingling. *Id.* In the case *sub judice,* however, the charges at issue were completely different, thereby assuaging any concern that they improperly reinforced each other.

Accordingly, we reject appellant's bald assertion that the jury's consideration of the attempted armed carjacking charge tainted its decision with respect to the murder conviction. Indeed, if we were to adopt appellant's argument, it would mean that in almost any case culminating in an acquittal as to some but not all charges, the jury is inevitably prejudiced. What the Court said in *People v. Graves,* 458 Mich. 476, 581 N.W.2d 229 (Mich.1998), mirrors our position: "We are persuaded by the view that a defendant has no room to complain when he is acquitted of a charge that is improperly submitted to a jury, as long as the defendant is actually convicted of a charge that was properly submitted to the jury. Such a result squares with respect for juries." *Id.* at 234.

### 3. Was the Evidence Sufficient to Support the Premeditated Murder Conviction?

Appellant maintains that the evidence was insufficient to convict him of first degree murder, because the State did not show that the shooting was deliberate and premeditated. He also asserts that the State offered no evidence as to motive, nor did the State present any evidence as to how the victim "came to be shot." Even if the jury could infer "intent to kill" based on the use of a handgun aimed at a vital part of the body, appellant vigorously argues that this does not constitute premeditation. Relying on several cases from other jurisdictions, appellant states: "The fact that the victim died of multiple wounds cannot, by itself, support a finding of premed-

itation and deliberation as contrasted with an impulsive frenzy."

The State responds that appellant's complaint is not preserved for review. Even if preserved, the State counters that appellant's claim lacks merit, because the number of shots fired at the victim constituted adequate evidence of premeditation and deliberation.

■■■■ We agree with the State that appellant has not preserved his sufficiency challenge, because the argument he advances here was not raised below. *See* Md. Rule 8–131(a). At the close of evidence, appellant stated that he had a two-pronged challenge to the murder indictment, based on the State's failure to make a *prima facie* case of criminal agency and a *prima facie* case as to *corpus delicti*. Appellant then deferred these arguments and, when he revisited the murder charge, counsel stated only generally, as to all counts, that the State failed to make a *prima facie* case regarding criminal agency. Appellant did not specifically address the murder charge again until the jury rendered its verdict. At that time, appellant contended that the verdicts were inconsistent, because the jury found appellant guilty of first degree murder but not guilty of second degree murder.[16] Thereafter, in his motion for a new trial, appellant renewed his contention that the verdicts were inconsistent. He argued that the finding of guilt as to first degree murder was legally inconsistent with the jury's finding of not guilty as to second degree murder.[17]

---

**16.** Appellant does not press this contention on appeal. We note, however, that the trial court disagreed that the verdicts were inconsistent. Nevertheless, the judge offered to clarify the matter by asking the jury "did they find [Mr. Braxton] not guilty of murder in the second degree because they found him guilty of murder in the first degree...." Because appellant "object[ed] to posing any questions to [the jury] whatsoever," the court refrained from taking any remedial measures.

**17.** The court disagreed, reasoning as follows:

If you are guilty of second degree murder then there is no premeditation.

But he did not claim that the evidence failed to establish premeditation and deliberation.

 Even if appellant's sufficiency claim is preserved, his argument is unavailing. In reviewing a challenge based on the sufficiency of the evidence, we must ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Briggs v. State,* 348 Md. 470, 475, 704 A.2d 904 (1998)(quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In other words, our task is to resolve whether "the evidence, circumstantial or otherwise, and the inferences that can reasonably be drawn from the evidence, would be sufficient to convince a rational trier of fact, beyond a reasonable doubt, of the guilt of the accused." *Hagez v. State,* 110 Md.App. 194, 204, 676 A.2d 992 (1996); *see also Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *Finke v. State,* 56 Md.App. 450, 467–78, 468 A.2d 353 (1983), *cert. denied,* 299 Md. 425, 474 A.2d 218, *and cert. denied,* 469 U.S. 1043, 105 S.Ct. 529, 83 L.Ed.2d 416 (1984). In accomplishing this task, we must not usurp the province of the trier of fact by assessing the credibility of the witnesses or by weighing the evidence. *Briggs,* 348 Md. at 475, 704 A.2d 904; *Jones v. State,* 343 Md. 448, 465, 682 A.2d 248 (1996); *McCoy v. State,* 118 Md.App. 535, 537–38, 703 A.2d 237 (1997). Rather, it is the jury's task to resolve conflicts in the evidence and decide the credibility of witnesses. *State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336 (1994). We defer to the factual findings of the jury, because it is in the best position to judge the credibility of the witnesses. *Streater v. State,* 119 Md.App.

---

So it's very consistent to say you are guilty of first degree murder with premeditation, and then say you are not guilty of second degree murder, because there is no premeditation to second degree murder.

\* \* \*

Well, in all candor what we should have done, you know, and I guess the buck stops here, is to tell the jury that if you find the defendant guilty of first degree murder, you don't have to go on to second degree murder.

The judge added that "it wasn't requested and I didn't do it."

267, 275, 704 A.2d 541 (1998); *see also Wiggins v. State,* 324 Md. 551, 565–67, 597 A.2d 1359 (1991), *cert. denied,* 503 U.S. 1007, 112 S.Ct. 1765, 118 L.Ed.2d 427 (1992).

Appellant complains that the evidence of four bullet wounds, including a wound to the head, "cannot standing alone, support a reasoned decision to kill." This assertion is refuted by several cases, including *State v. Raines,* 326 Md. 582, 606 A.2d 265 (1992). There, the Court held that evidence indicating that the perpetrator fired the pistol at the victim's head supported the trial court's findings that the murder was wilful, deliberate, and premeditated. *Id.* at 592, 606 A.2d 265 (citation omitted). The *Raines* Court reasoned that the perpetrator's actions in directing the shot at the driver's head permitted an inference that the offender "shot the gun with the intent to kill." *Id.* at 593, 606 A.2d 265 (citing *State v. Jenkins,* 307 Md. 501, 513–14, 515 A.2d 465 (1986)). The Court then reasoned: "Relying on that inference, the trial judge could rationally find, beyond a reasonable doubt, that the killing was wilful, deliberate, and premeditated so as to render [the defendant] guilty of first degree murder." *Id.* at 593, 606 A.2d 265. The case of *Willey v. State,* 328 Md. 126, 613 A.2d 956 (1992), is also instructive. There, the Court observed "that the delay between firing a first and a second shot was enough time for reflection and decision to justify a finding of premeditation and deliberation." *Id.* at 134, 613 A.2d 956 (citing *Tichnell v. State,* 287 Md. 695, 719–20, 415 A.2d 830 (1980) and *Gladden v. State,* 273 Md. 383, 387, 330 A.2d 176 (1974)).

In noticeable contrast to *Raines,* in which only one shot was fired at the victim's head, three out of the four shots fired at Mr. Alexander were directed to a vital part of the body. Thus, the jury could easily infer premeditation and deliberation. The jury also was entitled to consider appellant's fingerprint on the outside of the victim's car door, and ballistic tests showing that the bullets recovered from the victim's body were fired from the gun found in appellant's bedroom.

In essence, Braxton's complaint is that "the jury did not draw the inferences that he wished it to draw." *Hagez*, 110 Md.App. at 205, 676 A.2d 992. He overlooks that it is the function of the jury to decide what inferences to draw from proven facts. *McMillian v. State*, 325 Md. 272, 290, 600 A.2d 430 (1992); *Hagez*, 110 Md.App. at 205, 676 A.2d 992. The jury was certainly entitled to infer from the facts that "the defendant possess[ed] the intent to kill (wilful), that the defendant [had a] conscious knowledge of that intent (deliberate), and that there [was] time enough for the defendant to deliberate, *i.e.*, time enough to have thought about that intent (premeditate)." *Willey*, 328 Md. at 133, 613 A.2d 956.

## V. Robbery Trial [18]

### A. Factual Summary

At trial, the two victims of the armed robbery gave similar accounts of the occurrence. Both Mr. Williams and Mr. Carroll explained that at approximately 5:00 p.m. they were talking with each other along the side of Kevin Road in Baltimore City. At that time, while Mr. Williams's two children were waiting in his car, the victims were approached by two men, each brandishing weapons; one robber had a black .38 caliber gun with a short barrel, and the other had a chrome plated .25 caliber weapon with a brown handle. Both victims identified appellant at trial as the robber who wielded the .25 caliber handgun. In addition, Mr. Williams testified that he had identified appellant in a pretrial photo array. Both victims also stated that the .25 caliber gun recovered

---

18. Several indictments were consolidated for trial in the robbery case. Case No. 196165044 contained five counts pertaining to crimes allegedly committed against Mr. Carroll: robbery with a deadly weapon; assault with intent to rob; assault; unlawful use of a handgun in the commission of a felony or crime of violence; and unlawful wearing, carrying, or transporting a handgun. In Case No. 1916165047, appellant was charged with having committed the same offenses against Mr. Williams. Case Nos. 19165045 and 19165046 contained charges of reckless endangerment of Mr. Williams's children. These charges were dismissed at the close of all the evidence, when appellant moved for judgment of acquittal.

from appellant's home looked like the gun used in the robbery. Specifically, Mr. Williams said the weapon was "the gun [of] the person ... who robbed me that day." Mr. Carroll identified the gun by pointing to appellant and asserting that "it was in the hand of this guy over here."

After the robbers fled the scene, the victims explained that they flagged down Officer Marvin Credell. Officer Credell testified that the suspects were running up the street, approximately one block from where he was when he first spoke to the victims. He broadcast a description of the suspects on the police radio, and then entered his patrol vehicle to pursue the suspects. After unsuccessfully canvassing the area, Officer Credell returned to question the victims. During this interview, Officer Credell took notes regarding the descriptions of the guns. Later that evening, he gave his notes to his supervisor, Officer Terry Smith, who also prepared a report.

Officer Smith testified about the contents of his report. That testimony spawned a motion for mistrial. Detective Gwynn testified about the evidence recovered during the search of appellant's residence. His testimony, too, generated a mistrial motion. We shall discuss these matters in more detail, *infra.*

At the end of the State's case, appellant moved for judgment of acquittal as to all charges.[19] The defense submitted as to the armed robbery counts and the assault with intent to rob counts, and the court denied the motion.

In the defense case, appellant called several witnesses. His mother, Claudette Cook, testified that she lived with appellant in the apartment that was the subject of the search warrant. Ms. Cook explained that her son often stayed at his girlfriend's house, which was located around the corner. Ms. Cook also testified that Lawrence Shird, a family friend, was

---

**19.** The defense argued that the evidence was insufficient as to the handgun charges, because the State offered no evidence that the gun was a handgun under Maryland law. After a brief exchange, appellant agreed to stipulate that the gun was operable and met the definition of a handgun, pursuant to Md.Code, Art. 27 § 36B.

staying in her apartment at the time of the search, and he shared the front bedroom and bed with appellant.

Appellant's sister, Starr Braxton, also resided at 4310 Seminole Avenue, Apartment 203. Ms. Braxton testified that appellant stayed with his girlfriend many nights each week, and only spent about two nights per week in the family apartment. According to Ms. Braxton, Mr. Shird had been staying in appellant's bedroom for a few weeks prior to the police search.

Mr. Shird testified that he stayed in appellant's room while appellant was at his girlfriend's house. He also claimed that he had purchased the .25 caliber gun on May 2, 1996, because he "felt as though it would be nice to have one for my protection." Further, Mr. Shird asserted that he brought the gun to Ms. Cook's apartment, put it under the pillow in appellant's bedroom, and left it there. Mr. Shird also testified that he never showed the handgun to appellant, nor was he aware of a time when appellant saw the gun.

At the conclusion of the evidence, appellant renewed his motion for judgment of acquittal. This time, appellant submitted on all charges except the two reckless endangerment counts. The judge granted the motion as to those charges. Thereafter, the jury convicted appellant of the armed robberies of Mr. Carroll and Mr. Williams and the corresponding handgun offenses.

Subsequently, appellant moved for a new trial, complaining that the trial court erred in denying the suppression motion and that the evidence was insufficient to sustain the convictions. Defense counsel also argued that Braxton was severely prejudiced by Officer Smith's testimony, for which he claimed a mistrial was warranted. The judge responded that he did not believe any "harmful error" had occurred, even if "it was by [Officer Smith's] blurt of an officer being shot." Accordingly, the judge denied the motion.

We shall include additional facts in our discussion.

## B. Discussion

### 1. Did the court err in denying the motions for mistrial?

Appellant complains that the court erred in denying his two motions for mistrial. These motions were spawned by testimony from Officer Smith and Detective Gwynn. We shall explore first the motion that was based on the testimony of Detective Gwynn.

Appellant's attorney had indicated that he intended to challenge the detective's testimony that Braxton lived at 4310 Seminole Avenue, unless the detective could "demonstrate that he had personal knowledge that Mr. Braxton lived there." The court said: "I'm going to let him go forward. If you want to explore it, explore it on cross-examination." The court continued:

[A]s I see it, [Detective Gwynn is] testifying that [the premises searched] is where Mr. Braxton lives. You don't want him to say how he learned that, so you want the jury to believe that he didn't really know where he lives. The State, this is a question of fairness. The State has to have, or should have the opportunity, or it could be the other way around, you could have a witness who can testify as to where some of them lives. In other words, someone might believe, but basically where they live is a matter of opinion.

Later, Detective Gwynn testified that he sought to search 4310 Seminole Avenue after he obtained appellant's address from his arrest record. The following exchange is relevant:

[THE STATE]: What led you to 43[10] Seminole Avenue, Apartment 203?

[APPELLANT'S COUNSEL]: Objection.

[THE STATE]: What information?

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Overruled. Where did you get his address?

[GWYNN]: From his arrest record.

[APPELLANT'S COUNSEL]: Objection, move, move, ask to approach the bench.

At the bench, the following discussion ensued:

[APPELLANT'S COUNSEL]: Move, move for a mistrial.

THE COURT: I'm going to deny it. Give caution, instruction [sic].

\* \* \*

[THE STATE]: I did talk to him and that's not the answer.

[APPELLANT'S COUNSEL]: Well Judge, I just want the record to be made clear.

THE COURT: Well—

[APPELLANT'S COUNSEL]: I don't think a cautionary instruction is adequate to cure the prejudice in this case.

THE COURT: Okay. I understand.

[APPELLANT'S COUNSEL]: I move, I also move to strike the answer.

THE COURT: Okay.

[THE STATE]: Well can I ask it again in another way?

THE COURT: God knows what his next answer will be.

[THE STATE]: Can we call him up to the bench?

THE COURT: Yes. Please approach the bench.... When you were asked this question before, you said you got it out of a computer. There's a big difference between saying a computer and saying from an arrest record.

[GWYNN]: The arrest record came from a computer printout.

THE COURT: I didn't ask you that, though.

[GWYNN]: Okay, I understand the question. Your point, but it's all the same, it's all one and the same.

THE COURT: It's not one and the same.

[GWYNN]: I take the information in the computer. The page came up. I printed it. The printout came from the computer from his arrest record.

THE COURT: Well see, you jumped this time. It came from the computer, stop.

[GWYNN]: Okay.

After this exchange, the court promptly gave the following curative instruction:

Members of the jury, the witness gave an answer that I ordered to be stricken from the record and I also instruct you to disregard that answer.

This case is about the evidence that is produced in this courtroom, and that's not in the evidence in this case.

And do not, and I say this with as much emphasis as I can, do not in any way in your final deliberations, consider that last answer. It is stricken from the record and I am doing my best to strike it from your minds. Do not consider that answer as to how the address was obtained.

In the presence of the jury, the State then asked Detective Gwynn: "[W]hat led you to 43[10] Seminole Avenue, Apartment 203?" Over objection, Detective Gwynn responded: "The address was obtained from a computer."

We next recount the testimony of Officer Smith that generated the second mistrial motion. The prosecutor asked the officer if his report contained "descriptions of guns that were used in this offense." Over objection, the officer responded: "Yes ma'am." Inexplicably, in response to an inquiry as to where the officer obtained that information, Officer Smith said: "[T]he gun that's indicated in my report was used to shoot a police officer that night." In fact, the gun that was used in the police shooting was not the .25 caliber handgun allegedly used by appellant. Rather, it was the .38 caliber weapon allegedly used by appellant's cohort.

At an ensuing bench conference, the prosecutor insisted that she had "told" the officer "not to discuss" the police shooting. The prosecutor also suggested a curative instruction, indicating that the "defendant had nothing to do with [the police shooting]." The prosecutor was also willing to "stipulate" that the gun mentioned in Officer Smith's report was not the gun

used in the police shooting. Nevertheless, appellant moved for a mistrial. The court overruled the motion, subject "to clarification," stating: "[M]aybe you [the State] can ask him the caliber of the gun in his report, and if it's a .25, I'm going to grant a mistrial."

Thereafter, the prosecutor inquired of Officer Smith regarding the number of guns referred to in his report. The officer responded "one gun. One, and then an unknown caliber. Okay, this one is referring to a .25 caliber chrome handgun." The testimony prompted another bench conference, at which appellant's counsel renewed his motion for mistrial. He claimed that the disclosure of the shooting of a police officer (impliedly by appellant, because he allegedly used the .25 caliber gun), was "horrendously prejudicial." Defense counsel also insisted that the situation could not be remedied, because "the cat's already out of the bag and you can't put it back in." The judge disagreed, stating: "There's no cat in the bag if it doesn't involve this case." After reviewing the officer's report, the court verified that the report did, in fact, refer to two guns.

In the presence of the jury, Officer Smith then corrected his testimony by stating that a .25 caliber weapon was not involved in the police shooting. The following colloquy is relevant:

[THE STATE]: Officer Smith, what gun, strike that. I want to direct your attention to your report, back toward the bottom of the page. Was there a .25 caliber involved in the police shooting?

[SMITH]: No ma'am.

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Excuse me. Overruled.

[SMITH]: No ma'am.

[THE STATE]: And as far as you know, was the defendant charged with that police shooting or involved?

[APPELLANT'S COUNSEL]: Objection.

[THE STATE]: Strike that.

Later in his testimony, Officer Smith added that he obtained information that one robber had a .38 caliber weapon and the other wielded a .25 caliber weapon. The prosecutor asked: "And with regard to the guns and clothing, what information is contained in your report?" Over appellant's objection, the officer responded: "The information on the clothing on the first suspect, he was wearing blue sweatpants, blue and yellow jacket, and was armed with a .38 caliber handgun. Second suspect with reference to clothing, he was wearing a gray jacket, gray sweatpants, armed with a .25 caliber chrome handgun."

At another bench conference, the prosecutor offered to "go further and clarify that this defendant was not involved" in the police shooting. The witness was called to the bench, and verified what the prosecutor said. Thereafter, the prosecutor opted not to ask the officer any more questions before the jury. Instead, the State rested. We add that throughout the many discussions at the bench, the defense never requested a curative instruction, and none was given.

As we have seen, one mistrial motion followed testimony from Officer Smith suggesting that the weapon appellant used during the robbery was also used the same night in a police shooting. Appellant contends that this testimony was egregious, because it created the false impression that appellant was the one who shot the police officer. Consequently, appellant maintains that the only remedy was a mistrial. The other mistrial motion resulted from the testimony of Detective Gwynn, who disclosed that appellant had a prior arrest record. Appellant contends that this testimony, too, was unduly prejudicial.

 Our task is to decide whether the trial court abused its discretion in failing to grant the mistrial motions. In *Hunt v. State*, 321 Md. 387, 422, 583 A.2d 218 (1990), *cert. denied,* 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991), the Court said:

[T]he declaration of a mistrial is an extraordinary act which should only be granted if necessary to serve the ends of

justice. This Court has recognized that granting a motion for a mistrial lies within the discretion of the trial judge. The trial judge, who hears the entire case and can weigh the danger of prejudice arising from improper testimony, is in the best position to determine if the extraordinary remedy of a mistrial is appropriate. We will not reverse a trial court's denial of a motion for mistrial unless the defendant was so clearly prejudiced that the denial constituted an abuse of discretion.

*Id.* at 422, 583 A.2d 218 (internal citations omitted); *see Leak v. State,* 84 Md.App. 353, 357–58, 579 A.2d 788 (1990) (stating that " 'a trial judge shall declare a mistrial only under extraordinary circumstances and where there is a manifest necessity to do so' ") (quoting, *Russell v. State,* 69 Md.App. 554, 562, 518 A.2d 1081 (1987)).

Whether a mistrial is warranted hinges upon the question of prejudice to the defendant. *Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949 (1992); *State v. Hawkins,* 326 Md. 270, 276, 604 A.2d 489 (1992). Abuse of discretion will not be found unless it is clear that there has been "egregious prejudice" to the defendant. *Leak,* 84 Md.App. at 358, 579 A.2d 788. As we said in *Burks v. State,* 96 Md.App. 173, 188, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993): "[T]he decision as to whether a mistrial is called for is contingent upon the impact of an error and not upon the motivation behind the error." Moreover, the remarks must be "a direct and contributing factor that resulted in substantial prejudice to the defendant." *Leak,* 84 Md.App. at 358, 579 A.2d 788.

In *Guesfeird v. State,* 300 Md. 653, 480 A.2d 800 (1984), the Court identified several factors relevant to the evaluation of the prejudicial effect of improper testimony. The factors include

whether the reference to [inadmissible evidence] was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the wit-

ness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; [and] whether a great deal of other evidence exists.

*Id.* at 659, 480 A.2d 800. Nevertheless, the *Guesfeird* "factors are not exclusive and do not themselves comprise the test" for determining whether the defendant received a fair trial. *Kosmas v. State,* 316 Md. 587, 594, 560 A.2d 1137 (1989).

Although the remarks at issue in *Guesfeird* concerned references to a lie detector test, the Court in *Rainville* applied the same factors to "a different kind of inadmissible and prejudicial testimony." *Rainville,* 328 Md. at 408, 614 A.2d 949; *see also Coffey v. State,* 100 Md.App. 587, 599–600, 642 A.2d 276 (1994)(applying the factors to an officer's statements that the defendant was found guilty at an earlier trial.) There, the testimony in issue involved a mother's statement that the defendant, a boarder who was accused of sexually abusing her seven year old daughter, had been " 'in jail for what he had done' " to her nine year old son. *Rainville,* 328 Md. at 407, 614 A.2d 949. The *Rainville* Court found the mother's remark "particularly prejudicial because the defendant had not been convicted of any sexual offenses ... but was being held in jail pending trial on those charges." *Id.*

The disputed remarks in this case arguably concern "other crimes" evidence, in that they alluded to appellant's involvement in a police shooting and his prior arrest record. Case law dictates that "evidence of 'an accused's prior arrest, indictment or criminal activity, not resulting in conviction' is inadmissible." *Clark v. State,* 332 Md. 77, 83, 629 A.2d 1239 (1993) (quoting *Hall v. State,* 32 Md.App. 49, 57, 358 A.2d 632 (1976)). The rationale behind this concept is that

this type of evidence will prejudice the jury against the accused because of the jury's tendency to infer that the accused is a "bad man" who should be punished regardless of his guilt of the charged crime, or to infer that he committed the charged crime due to a criminal disposition.

*Tichnell v. State,* 287 Md. 695, 711, 415 A.2d 830 (1980) (citations omitted). Nevertheless, after analyzing the facts of this case in light of the cases we discussed above, we are satisfied that the court neither erred nor abused its discretion in denying the motions for mistrial.

Preliminarily, we point out that Officer Smith was not a particularly critical witness. Indeed, it is not altogether clear why the State called him to testify. There was never any dispute that the victims were robbed by two men, each of whom had a gun. Officer Credell was the one who responded to the scene, and he had already stated, as did the victims, that two guns were used in the robbery. Moreover, in his early testimony, Officer Smith acknowledged that his report referred to "guns."

In addition, the State's case against appellant was quite strong. The evidence indisputably showed that the victims were robbed by two assailants, each using a gun. Both victims identified Braxton at trial as the robber who wielded the .25 caliber weapon, and Mr. Williams also selected appellant's picture during a photo array. Moreover, a .25 caliber weapon was seized from appellant's apartment, and both victims identified the weapon to the extent possible. Of particular significance, despite the confusion in Officer Smith's testimony, the State eventually clarified the matter; Officer Smith acknowledged that two weapons were involved in the robbery, and the .25 caliber weapon was *not* the one involved in the police shooting. It is equally important that no evidence suggested that appellant was the robber who wielded the .38 caliber weapon, which was the one used in the unrelated police shooting. In light of all these factors, we see no basis to conclude that Officer Smith's confused testimony rose to the level of egregious prejudice.

With respect to Detective Gwynn's testimony that he obtained appellant's address from his arrest record, the trial court promptly gave a curative instruction. Any prejudice that may have resulted from Detective Gwynn's testimony was immediately extinguished.

We reiterate that a mistrial is a "rather extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice." *Burks,* 96 Md.App. at 187, 624 A.2d 1257. It is the trial judge who is "in the best position to assess the relative impact of the [offending statements]. . . ." *Burks,* 96 Md.App. at 189, 624 A.2d 1257. Applying the principles that we elucidated earlier, we are satisfied that the judge did not abuse his discretion in denying the mistrial motions.

**2. Was the evidence sufficient to support the armed robbery convictions?**

Appellant contends that the evidence adduced in Trial II was insufficient to sustain his armed robbery convictions. To support this assertion, appellant relies on his challenges to the identifications made at trial and at the photo array. Furthermore, appellant argues that he produced strong evidence demonstrating that the gun was not his and, therefore, he could not have been the robber. Conversely, the State argues that the strong identification testimony provided by both victims constituted ample evidence to uphold the conviction. We agree with the State.

At the outset, we note that appellant failed to posit any grounds to support either of his motions for judgment of acquittal. Instead, when the State rested, and again at the close of all the evidence, appellant merely submitted as to the robbery charges. Maryland law is well settled that this does not satisfy the particularity requirements of Md. Rule 4–324(a). *State v. Lyles,* 308 Md. 129, 134–36, 517 A.2d 761 (1986); *Brummell v. State,* 112 Md.App. 426, 428–29, 685 A.2d 835 (1996); *Garrison v. State* 88 Md.App. 475, 478, 594 A.2d 1264 (1991), *cert. denied,* 325 Md. 249, 600 A.2d 418 (1992). Consequently, any complaint that appellant raises with respect to the sufficiency of the evidence pertaining to the armed robbery charge has been waived.

Even if preserved, appellant's claim has no merit. Robbery has been defined as " 'the felonious taking and carrying away of the personal property of another, from his person or in his

presence, by violence or putting in fear, or, more succinctly, as larceny from the person, accompanied by violence or putting in fear.'" *Ball v. State,* 347 Md. 156, 184, 699 A.2d 1170 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998) (quoting *West v. State,* 312 Md. 197, 202, 539 A.2d 231 (1988)) (citations omitted); *see also Conyers v. State,* 345 Md. 525, 558, 693 A.2d 781 (1997); *Snowden v. State,* 321 Md. 612, 618, 583 A.2d 1056 (1991) (robbery "is a larceny from the person accomplished by either an assault (putting in fear) or a battery (violence)"); *Williams v. State,* 110 Md.App. 1, 38, 675 A.2d 1037 (1996) (robbery is "the felonious taking and carrying away of another's property, of any value whatsoever, by violence or putting in fear"). Robbery with a deadly weapon is not a separate substantive offense from the crime of robbery. Rather, if the State can prove that the defendant used a deadly weapon in the commission of the robbery, then the defendant may be subject to harsher penalties. Md.Code (1957, 1996 Repl.Vol.), Art. 27 §§ 486, 488.

 Maryland courts have long recognized that an "[i]dentification by the victim is ample evidence to sustain a conviction." *Branch v. State,* 305 Md. 177, 183, 502 A.2d 496 (1986) (citations omitted); see *Mobley and King v. State,* 270 Md. 76, 89, 310 A.2d 803 (1973), *cert. denied,* 416 U.S. 975, 94 S.Ct. 2003, 40 L.Ed.2d 564 (1974); *Kirby v. State,* 48 Md.App. 205, 211, 426 A.2d 423, *cert. denied,* 291 Md. 777 (1981). Therefore, we conclude that the in-court and pretrial identifications of appellant as one of the robbers, made by two victims, coupled with their descriptions of the weapon, were more than sufficient for a rational trier of fact to determine, beyond a reasonable doubt, that appellant committed the armed robbery of Mr. Williams and Mr. Carroll.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**